Justice Breyer
delivered the opinion of the Court.
Federal statutes impose mandatory minimum prison sentences upon those convicted of federal drug crimes. These statutes typically base the length of a minimum prison term upon the kind and amount of the drug involved. Until 2010, the relevant statute imposed upon an offender who dealt in powder cocaine the same sentence it imposed upon an offender who dealt in one one-hundredth that amount of crack cocaine. It imposed, for example, the same 5-year minimum *264 term upon (1) an offender convicted of possessing with intent to distribute 500 grams of powder cocaine as upon (2) an offender convicted of possessing with intent to distribute 5 grams of crack.
In 2010, Congress enacted a new statute reducing the crack-to-powder cocaine disparity from 100-to-l to 18-to-l. Fair Sentencing Act, 124 Stat. 2372. The new statute took effect on August 3, 2010. The question here is whether the Act’s more lenient penalty provisions apply to offenders who committed a crack cocaine crime before August 3, 2010, but were not sentenced until after August 3. We hold that the new, more lenient mandatory minimum provisions do apply to those pre-Act offenders.
I—I
The underlying question before us is one of congressional intent as revealed in the Fair Sentencing Act’s language, structure, and basic objectives. Did Congress intend the Act’s more lenient penalties to apply to pre-Act offenders sentenced after the Act took effect?
We recognize that, because of important background principles of interpretation, we must assume that Congress did not intend those penalties to apply unless it clearly indicated to the contrary. See infra, at 273-276. But we find that clear indication here. We rest our conclusion primarily upon the fact that a contrary determination would seriously undermine basic Federal Sentencing Guidelines objectives such as uniformity and proportionality in sentencing. Indeed, seen from that perspective, a contrary determination would (in respect to relevant groups of drug offenders) produce sentences less uniform and more disproportionate than if Congress had not enacted the Fair Sentencing Act at all. See infra, at 276-279.
Because our conclusion rests upon an analysis of the Guidelines-based sentencing system Congress has established, we describe that system at the outset and include *265 an explanation of how the Guidelines interact with federal statutes setting forth specific terms of imprisonment.
A
The Guidelines originate in the Sentencing Reform Act of 1984, 98 Stat. 1987. That statute created a federal Sentencing Commission instructed to write guidelines that judges would use to determine sentences imposed upon offenders convicted of committing federal crimes. 28 U. S. C. §§ 991, 994. Congress thereby sought to increase transparency, uniformity, and proportionality in sentencing. United States Sentencing Commission (USSC or Commission), Guidelines Manual § 1A1.3, p. 2 (Nov. 2011) (USSG); see 28 U.S. C. §§ 991(b)(1), 994(f).
The Sentencing Reform Act directed the Commission to create in the Guidelines categories of offense behavior (e. g., “ ‘bank robbery/committed with a gun/$2500 taken' ”) and offender characteristics (e. g., “one prior conviction”). USSG §1A1.2, at 1; see 28 U. S. C. §§994(a)-(e). A sentencing judge determines a Guidelines range by (1) finding the applicable offense level and offender category and then (2) consulting a table that lists proportionate sentencing ranges (e. g., 18 to 24 months of imprisonment) at the intersections of rows (marking offense levels) and columns (marking offender categories). USSG ch. 5, pt. A, Sentencing Table, §§5E1.2, 7B1.4; see also §lA1.4(h), at 11. The Guidelines, after telling the judge how to determine the applicable offense level and offender category, instruct the judge to apply the intersection’s range in an ordinary case, but they leave the judge free to depart from that range in an unusual case. See 18 U. S. C. § 3553(b); USSG §§ 1A1.2, at 1-2, 1A1.4(b), at 6-7. This Court has held that the Guidelines are now advisory. United States v. Booker, 543 U. S. 220, 245, 264 (2005); see Kimbrough v. United States, 552 U. S. 85, 91 (2007).
The Guidelines determine most drug-crime offense levels in a special way. They set forth a “Drug Quantity Table” *266 (or Table) that lists amounts of various drugs and associates different amounts with different “Base Offense Levels” (to which a judge may add or subtract levels depending upon the “specific” characteristics of the offender’s behavior). See USSG §2D1.1. The Table, for example, associates 400 to 499 grams of powder cocaine with a base offense level of 24, a level that would mean for a first-time offender a prison term of 51 to 63 months. §2Dl.l(e).
In 1986, Congress enacted a more specific, drug-related sentencing statute, the Anti-Drug Abuse Act (1986 Drug Act), 100 Stat. 3207. That statute sets forth mandatory minimum penalties of 5 and 10 years applicable to a drug offender depending primarily upon the kind and amount of drugs involved in the offense. See 21 U. S. C. §§ 841(b)(1) (A)-(C) (2006 ed. and Supp. IV). The minimum applicable to an offender convicted of possessing with intent to distribute 500 grams or more of powder cocaine is 5 years, and for 5,000 grams or more of powder the minimum is 10 years. §§841(b)(l)(A)(ii), (B)(ii). The 1986 Drug Act, however, treated crack cocaine crimes as far more serious. It applied its 5-year minimum to an offender convicted of possessing with intent to distribute only 5 grams of crack (as compared to 500 grams of powder) and its 10-year minimum to one convicted of possessing with intent to distribute only 50 grams of crack (as compared to 5,000 grams of powder), thus producing a 100-to-l crack-to-powder ratio. §§ 841(b)(l)(A)(iii), (B)(iii) (2006 ed.).
The 1986 Drug Act, like other federal sentencing statutes, interacts with the Guidelines in an important way. Like other sentencing statutes, it trumps the Guidelines. Thus, ordinarily no matter what the Guidelines provide, a judge cannot sentence an offender to a sentence beyond the maximum contained in the federal statute setting forth the crime of conviction. Similarly, ordinarily no matter what range the Guidelines set forth, a sentencing judge must sentence an offender to at least the minimum prison term set forth in *267 a statutory mandatory minimum. See 28 U. S. C. §§ 994(a), (b)(1); USSG § 5G1.1; Neal v. United States, 516 U.S. 284, 289-290, 295 (1996).
Not surprisingly, the Sentencing Commission incorporated the 1986 Drug Act’s mandatory mínimums into the first version of the Guidelines themselves. Kimbrough, supra, at 96-97. It did so by setting a base offense level for a first-time drug offender that corresponded to the lowest Guidelines range above the applicable mandatory minimum. USSC, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 53-54 (Oct. 2011) (2011 Report). Thus, the first Guidelines Drug Quantity Table associated 500 grams of powder cocaine with an offense level of 26, which for a first-time offender meant a sentencing range of 63 to 78 months (just above the 5-year minimum), and it associated 5,000 grams of powder cocaine with an offense level of 32, which for a first-time offender meant a sentencing range of 121 to 151 months (just above the 10-year minimum). USSG §2D1.1 (Oct. 1987). Further reflecting the 1986 Drug Act’s 100-to-l crack-to-powder ratio, the Table associated an offense level of 26 with 5 grams of crack and an offense level of 32 with 50 grams of crack. Ibid.
In addition, the Drug Quantity Table set offense levels for small drug amounts that did not trigger the 1986 Drug Act’s mandatory mínimums so that the resulting Guidelines sentences would remain proportionate to the sentences for amounts that did trigger these mínimums. 2011 Report 54. Thus, the Table associated 400 grams of powder cocaine (an amount that fell just below the amount triggering the 1986 Drug Act’s 5-year minimum) with an offense level of 24, which for a first-time offender meant a sentencing range of 51 to 63 months (the range just below the 5-year minimum). USSG § 2D 1.1 (Oct. 1987). Following the 100-to-l crack-to-powder ratio, the Table associated four grams of crack (an amount that also fell just below the amount triggering the *268 1986 Drug Act’s 5-year minimum) with an offense level of 24. Ibid.
The Commission did this not because it necessarily thought that those levels were most in keeping with past sentencing practice or would independently have reflected a fair set of sentences, but rather because the Commission believed that doing so was the best way to keep similar drug-trafficking sentences proportional, thereby satisfying the Sentencing Reform Act’s basic “proportionality” objective. See Kimbrough, 552 U. S., at 97; USSG § 1A1.3 (Nov. 2011); 2011 Report 53-54, 349, and n. 845. For this reason, the Commission derived the Drug Quantity Table’s entire set of crack and powder cocaine offense levels by using the 1986 Drug Act’s two (5- and 10-year) minimum amounts as reference points and then extrapolating from those two amounts upward and downward to set proportional offense levels for other drug amounts. Ibid.
B
During the next two decades, the Commission and others in the law enforcement community strongly criticized Congress’ decision to set the crack-to-powder mandatory minimum ratio at 100 to 1. The Commission issued four separate reports telling Congress that the ratio was too high and unjustified because, for example, research showed the relative harm between crack and powder cocaine less severe than 100 to 1, because sentences embodying that ratio could not achieve the Sentencing Reform Act’s “uniformity” goal of treating like offenders alike, because they could not achieve the “proportionality” goal of treating different offenders (e. g., major drug traffickers and low-level dealers) differently, and because the public had come to understand sentences embodying the 100-to-l ratio as reflecting unjustified race-based differences. Kimbrough, supra, at 97-98; see, e. g., USSC, Special Report to the Congress: Cocaine and Federal Sentencing Policy 197-198 (Feb. 1995) (1995 Report); *269 USSC, Special Report to Congress: Cocaine and Federal Sentencing Policy 8 (Apr. 1997) (1997 Report); USSC, Report to Congress: Cocaine and Federal Sentencing Policy 91, 103 (May 2002) (2002 Report); USSC, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007) (2007 Report). The Commission also asked Congress for new legislation embodying a lower crack-to-powder ratio. 1995 Report 198-200; 1997 Report 9-10; 2002 Report 103-107; 2007 Report 6-9. And the Commission recommended that the legislation “include” an “emergency amendment” allowing “the Commission to incorporate the statutory changes” in the Guidelines while “minimiz[ing] the lag between any statutory and guideline modifications for cocaine offenders.” Id., at 9.
In 2010, Congress accepted the Commission’s recommendations, see 2002 Report 104; 2007 Report 8-9, and n. 26, and enacted the Fair Sentencing Act into law. The Act increased the drug amounts triggering mandatory mínimums for crack trafficking offenses from 5 grams to 28 grams in respect to the 5-year minimum and from 50 grams to 280 grams in respect to the 10-year minimum (while leaving powder at 500 grams and 5,000 grams respectively). § 2(a), 124 Stat. 2372. The change had the effect of lowering the 100-to-1 crack-to-powder ratio to 18 to 1. (The Act also eliminated the 5-year mandatory minimum for simple possession of crack. § 3,124 Stat. 2372.)
Further, the Fair Sentencing Act instructed the Commission to “make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.” § 8(2), id., at 2374. And it directed the Commission to “promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days” after the new Act took effect. § 8(1), ibid.
*270 The Fair Sentencing Act took effect on August 3, 2010. The Commission promulgated conforming emergency Guidelines amendments that became effective on November 1, 2010. 75 Fed. Reg. 66188 (2010). A permanent version of those Guidelines amendments took effect on November 1, 2011. See 76 id., at 24960 (2011).
C
With this background in mind, we turn to the relevant facts of the cases before us. Corey Hill, one of the petitioners, unlawfully sold 53 grams of crack in March 2007, before the Fair Sentencing Act became law. App. in No. 11-5721, pp. 6, 83 (hereinafter Hill App.). Under the 1986 Drug Act, an offender who sold 53 grams of crack was subject to a 10-year mandatory minimum. 21 U. S. C. § 841(b)(1)(A)(iii) (2006 ed.). Hill was not sentenced, however, until December 2010, after the Fair Sentencing Act became law and after the new Guidelines amendments had become effective. Hill App. 83-94. Under the Fair Sentencing Act, an offender who sold 53 grams of crack was subject to a 5-year, not a 10-year, minimum. §841(b)(1)(B)(iii) (2006 ed., Supp. IV). The sentencing judge stated that, if he thought that the Fair Sentencing Act applied, he would have sentenced Hill to that Act’s 5-year minimum. Id., at 69. But he concluded that the Fair Sentencing Act’s lower mínimums apply only to those who committed a drug crime after August 3, 2010— the Act’s effective date. Id., at 65, 68. That is to say, he concluded that the new Act’s more lenient sentences did not apply to those who committed a crime before August 3, even if they were sentenced after that date. Hence, the judge sentenced Hill to 10 years of imprisonment. Id., at 78. The Court of Appeals for the Seventh Circuit affirmed. 417 Fed. Appx. 560 (2011).
The second petitioner, Edward Dorsey (who had previously been convicted of a drug felony), unlawfully sold 5.5 grams of crack in August 2008, before the Fair Sentencing *271 Act took effect. App. in No. 11-5683, pp. 9, 48-49, 57-58 (hereinafter Dorsey App.). Under the 1986 Drug Act, an offender such as Dorsey with a prior drug felony who sold 5.5 grams of crack was subject to a 10-year minimum. § 841 (b)(1)(B)(iii) (2006 ed.). Dorsey was not sentenced, however, until September 2010, after the new Fair Sentencing Act took effect. Id., at 84-95. Under the Fair Sentencing Act, such an offender who sold 5.5 grams of crack was not subject to a mandatory minimum at all, for 5.5 grams is less than the 28 grams that triggers the new Act’s mandatory minimum provisions. § 841(b)(1)(B)(iii) (2006 ed., Supp. IV). Dorsey asked the judge to apply the Fair Sentencing Act’s more lenient statutory penalties. Id., at 54-55.
Moreover, as of Dorsey’s sentencing in September 2010, the unrevised Guidelines (reflecting the 1986 Drug Act’s old mínimums) were still in effect. The Commission had not yet finished revising the Guidelines to reflect the new, lower statutory mínimums. And the basic sentencing statute, the Sentencing Reform Act, provides that a judge shall apply the Guidelines that “are in effect on the date the defendant is sentenced.” 18 U. S. C. § 3553(a)(4)(A)(ii).
The sentencing judge, however, had the legal authority not to apply the Guidelines at all (for they are advisory). But he also knew that he could not ignore a minimum sentence contained in the applicable statute. Dorsey App. 67-68. The judge noted that, even though he was sentencing Dorsey after the effective date of the Fair Sentencing Act, Dorsey had committed the underlying crime prior to that date. Id., at 69-70. And he concluded that the 1986 Drug Act’s old mínimums, not the new Fair Sentencing Act, applied in those circumstances. Ibid. He consequently sentenced Dorsey to the 1986 Drug Act’s 10-year mandatory minimum term. Id., at 80. The Court of Appeals for the Seventh Circuit affirmed, United States v. Fisher, 635 F. 3d 336 (2011), and denied rehearing en banc, 646 F. 3d 429 (2011) (per curiam); see also United States v. Holcomb, 657 F. 3d 445 (CA7 2011).
*272 The Courts of Appeals have come to different conclusions as to whether the Fair Sentencing Act’s more lenient mandatory mínimums apply to offenders whose unlawful conduct took place before, but whose sentencing took place after, the date that Act took effect, namely, August 3, 2010. Compare United States v. Douglas, 644 F. 3d 39, 42-44 (CA1 2011) (Act applies), and United States v. Dixon, 648 F. 3d 195, 203 (CA3 2011) (same), with 635 F. 3d, at 339-340 (Act does not apply), United States v. Sidney, 648 F. 3d 904, 910 (CA8 2011) (same), and United States v. Tickles, 661 F. 3d 212, 215 (CA5 2011) (per curiam) (same). In light of that disagreement, we granted Hill’s and Dorsey’s petitions for certiorari. Since petitioners and the Government both take the position that the Fair Sentencing Act’s new mínimums do apply in these circumstances, we appointed as amicus curiae Miguel Estrada to argue the contrary position. He has ably discharged his responsibilities.
I—I
A
The timing issue before us is difficult in part because relevant language in different statutes argues in opposite directions. See Appendix A, infra. On the one hand, a federal saving statute, Act of Feb. 25, 1871 (1871 Act), § 4, 16 Stat. 432, phrased in general terms, provides that a new criminal statute that “repeal[s]” an older criminal statute shall not change the penalties “incurred” under that older statute “unless the repealing Act shall so expressly provide.” 1 U. S. C. § 109. Case law makes clear that the word “repeal” applies when a new statute simply diminishes the penalties that the older statute set forth. See Warden v. Marrero, 417 U. S. 653, 659-664 (1974); see also United States v. Tynen, 11 Wall. 88, 92 (1871). Case law also makes clear that penalties are “incurred” under the older statute when an offender becomes subject to them, i. e., commits the underlying conduct that makes the offender liable. See United States v. Reisinger, *273 128 U. S. 398, 401 (1888); Great Northern R. Co. v. United States, 208 U. S. 452, 464-470 (1908),
On the other hand, the Sentencing Reform Act says that, regardless of when the offender’s conduct occurs, the applicable Guidelines are the ones “in effect on the date the defendant is sentenced.” 18 U. S. C. § 3553(a)(4)(A)(ii). And the Fair Sentencing Act requires the Commission to change the Guidelines in the wake of the Act’s new mínimums, making them consistent with “other guideline provisions and applicable law.” § 8(2), 124 Stat. 2374.
Courts that have held that they must apply the old, higher 1986 Drug Act mínimums to all pre-Act offenders, including those sentenced after the Fair Sentencing Act took effect, have emphasized that the 1871 Act requires that result unless the Fair Sentencing Act either expressly says or at least by fair implication implies the contrary. See 635 F. 3d, at 339-340; Sidney, supra, at 906-908; Tickles, supra, at 214-215; see also Holcomb, supra, at 446-448 (opinion of Easter-brook, J.). Courts that have concluded that the Fair Sentencing Act’s more lenient penalties apply have found in that Act, together with the Sentencing Reform Act and other related circumstances, indicia of a clear congressional intent to apply the new Act’s mínimums. See Douglas, supra, at 42-44; Dixon, supra, at 199-203; see also Holcomb, 657 F. 3d, at 454-457 (Williams, J., dissenting from denial of rehearing en banc); id., at 461-463 (Posner, J., dissenting from denial of rehearing en bane). We too take the latter view. Six considerations, taken together, convince us that Congress intended the Fair Sentencing Act’s more lenient penalties to apply to those offenders whose crimes preceded August 3, 2010, but who are sentenced after that date.
First, the 1871 saving statute permits Congress to apply a new Act’s more lenient penalties to pre-Act offenders without expressly saying so in the new Act. It is true that the 1871 Act uses the words “expressly provide.” 1 U. S. C. § 109. But the Court has long recognized that this saving *274 statute creates what is in effect a less demanding interpretive requirement. That is because statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified. See, e. g., Fletcher v. Peck, 6 Cranch 87, 135 (1810); Reichelderfer v. Quinn, 287 U. S. 315, 318 (1932). And Congress remains free to express any such intention either expressly or by implication as it chooses.
Thus, the Court has said that the 1871 Act “cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment.” Great Northern R. Co., supra, at 465 (emphasis added). And in a comparable context the Court has emphasized that the Administrative Procedure Act’s use of the word “expressly” does not require Congress to use any “magical passwords” to exempt a later statute from the provision. Marcello v. Bonds, 349 U. S. 302, 310 (1955). Without requiring an “express” statement, the Court has described the necessary indicia of congressional intent by the terms “necessary implication,” “clear implication,” and “fair implication,” phrases it has used interchangeably. Great Northern R. Co., supra, at 465, 466; Hertz v. Woodman, 218 U. S. 205, 218 (1910); Marrero, supra, at 660, n. 10. One Member of the Court has said we should determine whether “the plain import of a later statute directly conflicts with an earlier statute,” and, if so, “the later enactment governs, regardless of its compliance with any earlier-enacted requirement of an express reference or other ‘magical password.’ ” Lockhart v. United States, 546 U. S. 142, 149 (2005) (Scalia, J., concurring).
Hence, the Court has treated the 1871 Act as setting forth an important background principle of interpretation. The Court has also assumed Congress is well aware of the background principle when it enacts new criminal statutes. *275 E. g., Great Northern R. Co., supra, at 465; Hertz, supra, at 217; cf. Marcello, supra, at 310. And the principle requires courts, before interpreting a new criminal statute to apply its new penalties to a set of pre-Act offenders, to assure themselves that ordinary interpretive considerations point clearly in that direction. Words such as “plain import,” “fair implication,” or the like reflect the need for that assurance. And it is that assurance, which we shall assume is conveyed by the phrases “plain import” or “fair implication,” that we must look for here.
Second, the Sentencing Reform Act sets forth a special and different background principle. That statute says that when “determining the particular sentence to be imposed” in an initial sentencing, the sentencing court “shall consider,” among other things, the “sentencing range” established by the Guidelines that are “in effect on the date the defendant is sentenced.” 18 U. S. C. § 3553(a)(4)(A)(ii) (emphasis added). Although the Constitution’s Ex Post Facto Clause, Art. I, § 9, cl. 3, prohibits applying a new Act’s higher penalties to pre-Act conduct, it does not prohibit applying lower penalties. See Calder v. Bull, 3 Dall. 386, 390-391 (1798); Collins v. Youngblood, 497 U. S. 37, 41-44 (1990). The Sentencing Commission has consequently instructed sentencing judges to “use the Guidelines Manual in effect on the date that the defendant is sentenced,” regardless of when the defendant committed the offense, unless doing so “would violate the ex post facto clause.” USSG § 1B1.11. And therefore when the Commission adopts new, lower Guidelines amendments, those amendments become effective to offenders who committed an offense prior to the adoption of the new amendments but are sentenced thereafter. Just as we assume Congress was aware of the 1871 Act’s background norm, so we assume that Congress was aware of this different background sentencing principle.
Third, language in the Fair Sentencing Act implies that Congress intended to follow the Sentencing Reform Act *276 background principle here. A section of the Fair Sentencing Act entitled “Emergency Authority for United States Sentencing Commission” requires the Commission to promulgate “as soon as practicable” (and not later than 90 days after August 3, 2010) “conforming amendments” to the Guidelines that “achieve consistency with other guideline provisions and applicable law.” § 8, 124 Stat. 2374. Read most naturally, “applicable law” refers to the law as changed by the Fair Sentencing Act, including the provision reducing the crack mandatory mínimums. § 2(a), id., at 2372. As the Commission understood this provision, achieving consistency with “other guideline provisions” means reducing the base offense levels for all crack amounts proportionally (using the new 18-to-1 ratio), including the offense levels governing small amounts of crack that did not fall within the scope of the mandatory minimum provisions. 75 Fed. Reg. 66191. And consistency with “other guideline provisions” and with prior Commission practice would require application of the new Guidelines amendments to offenders who committed their offense prior to the new amendments’ effective date but were sentenced thereafter. See USSG § 1B1.11(a); e. g., USSG App. C, amdts. 706, 711 (Supp. Nov. 2004-Nov. 2007); see also Memorandum from G. Schmitt, L. Reed, & K. Cohen, USSC, to Chair Hinojosa et al., Subject: Analysis of the Impact of the Crack Cocaine Amendment if Made Retroactive 23 (Oct. 3, 2007). Cf. USSG App. C, amdt. 571 (Nov. 1987-Nov. 1997) (amendment increasing restitution, which may present ex post facto and one-book-rule concerns, would apply only to defendants sentenced for postamendment offenses), discussed post, at 292 (Scalia, J., dissenting).
Fourth, applying the 1986 Drug Act’s old mandatory mín-imums to the post-August 3 sentencing of pre-August 3 offenders would create disparities of a kind that Congress enacted the Sentencing Reform Act and th¿e Fair Sentencing Act to prevent. Two individuals with the same number of prior offenses who each engaged in the same criminal con *277 duct involving the same amount of crack and were sentenced at the same time would receive radically different sentences. For example, a first-time post-Act offender with five grams of crack, subject to a Guidelines range of 21 to 27 months, could receive two years of imprisonment, while an otherwise identical pre-Act offender would have to receive the 5-year mandatory minimum. Compare USSG § 2D1.1(c) (Nov. 2011) with 21 U. S. C. § 841(b)(1)(B) (2006 ed.). A first-time post-Act 50-gram offender would be subject to a Guidelines range of less than six years of imprisonment, while his otherwise identical pre-Act counterpart would have to receive the 10-year mandatory minimum. Compare USSG § 2D1.1(c) (Nov. 2011) with 21 U. S. C. § 841(b)(1)(A) (2006 ed.).
Moreover, unlike many prechange/postchange discrepancies, the imposition of these disparate sentences involves roughly contemporaneous sentencing, i. e., the same time, the same place, and even the same judge, thereby highlighting a kind of unfairness that modern sentencing statutes typically seek to combat. See, e. g., 28 U. S. C. § 991(b)(1)(B) (purposes of Guidelines-based sentencing include “avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct”); S. Rep. No. 98-223, p. 74 (1983) (explaining rationale for using same, current Guidelines for all roughly contemporaneous sentencings). Further, it would involve imposing upon the pre-Act offender a pre-Act sentence at a time after Congress had specifically found in the Fair Sentencing Act that such a sentence was unfairly long.
Finally, one cannot treat such problems as if they were minor ones. Given the 5-year statute of limitations for federal drug offenses, the 11-month median time between indictment and sentencing for those offenses, and the approximately 5,000 federal crack offenders convicted each year, many pre-Act offenders were not (and will not be) sentenced until after August 3,2010, when the new, more lenient mandatory minimums took effect. See 18 U. S. C. § 3282(a); *278 Administrative Office of United States Courts, Judicial Business of the United States Courts, p. 272 (2010) (Table D-10); 2011 Report 191.
Fifth, not to apply the Fair Sentencing Act would do more than preserve a disproportionate status quo; it would make matters worse. It would create new anomalies—new sets of disproportionate sentences—not previously present. That is because sentencing courts must apply new Guidelines (consistent with the Fair Sentencing Act’s new mínimums) to pre-Act offenders, see supra, at 275, and the 1986 Drug Act’s old mínimums would trump those new Guidelines for some pre-Act offenders but not for all of them—say, pre-Act offenders who possessed crack in small amounts not directly the subject of mandatory mínimums.
Consider, for example, a first-time offender convicted of possessing with intent to distribute four grams of crack. No mandatory sentence, under the 1986 Drug Act or the Fair Sentencing Act, applies to an offender possessing so small an amount. Yet under the old law, the Commission, charged with creating proportionate sentences, had created a Guidelines range of 41 to 51 months for such an offender, a sentence proportional to the 60 months that the 1986 Drug Act required for one who trafficked five grams of crack. See supra, at 266-268; USSG § 2D1.1(c) (Nov. 2009).
The Fair Sentencing Act, however, requires the Commission to write new Guidelines consistent with the new law. The Commission therefore wrote new Guidelines that provide a sentencing range of 21 to 27 months—about two years—for the first-time, 4-gram offender. See USSG §2D1.1(c) (Nov. 2011). And the Sentencing Reform Act requires application of those new Guidelines to all offenders (including pre-Act offenders) who are sentenced once those new Guidelines take effect. See 18 U. S. C. § 3553(a)(4) (A)(ii). Those new Guidelines must take .effect and apply to a pre-Act 4-gram offender, for such an offender was never subject to a trumping statutory 1986 Drug Act mandatory *279 minimum. However, unless the Fair Sentencing Act’s new, more lenient mandatory mínimums apply to pre-Act offenders, an otherwise identical offender who possessed five grams would have to receive a 5-year sentence. See 21 U. S. C. § 841(b)(1)(B) (2006 ed., Supp. IV).
For example, imagine that on July 1, 2010, both Smith and Jones commit a crack crime identical but for the fact that Smith possesses with intent to distribute four grams of crack and Jones five grams. Both are sentenced on December 1, 2010, after the Fair Sentencing Act and the new Guidelines take effect. Smith’s Guidelines sentence would be two years, but unless the Fair Sentencing Act applies, Jones’ sentence would have to be five years. The difference of one gram would make a difference, not of only one year as it did before enactment of the Fair Sentencing Act, but instead of three years. Passage of the new Act, designed to have brought about fairer sentences, would here have created a new disparate sentencing “cliff.”
Nor can one say that the new Act would produce dispro-portionalities like this in only a few cases. In fiscal year 2010, 17.8 percent of all crack offenders were convicted of offenses not subject to the 1986 Drug Act’s mínimums. 2011 Report 191. And since those mínimums apply only to some drug offenders and they apply in different ways, one can find many similar examples of disproportionalities. See Appendix B, infra. Thus, application of the 1986 Drug Act mínimums to pre-Act offenders sentenced after the new Guidelines take effect would produce a crazy quilt of sentences, at odds with Congress’ basic efforts to achieve more uniform, more proportionate sentences. Congress, when enacting the Fair' Sentencing Act, could not have intended any such result.
Sixth, we have found no strong countervailing consideration. Amicus and the dissent argue that one might read much of the statutory language we have discussed as embodying exceptions, permitting the old 1986 Drug Act mini *280 mums to apply to pre-Act offenders sentenced after August 3, 2010, when the Fair Sentencing Act took effect. The words “applicable law” in the new Act, for example, could, linguistically speaking, encompass the 1986 Drug Act minimums applied to those sentenced after August 3. Post, at 291-292 (Scalia, J., dissenting). Moreover, Congress could have insisted that the Commission write new Guidelines with special speed to assure itself that new, post-August 3 offenders—but not old, pre-August 3 offenders—would receive the benefit of the new Act. Post, at 292-294. Further, amicus and the dissent note that to apply the new Act’s mínimums to the old, pre-August 3 offenders will create a new disparity—one between pre-Act offenders sentenced before August 3 and those sentenced after that date. Post, at 295.
We do not believe that these arguments make a critical difference. Even if the relevant statutory language can be read as amicus and the dissent suggest and even if Congress might have wanted Guidelines written speedily simply in order to apply them quickly to new offenders, there is scant indication that this is what Congress did mean by the language in question nor that such was in fact Congress’ motivation. The considerations we have set forth, supra, at 276-279, strongly suggest the contrary.
We also recognize that application of the new mínimums to pre-Act offenders sentenced after August 3 will create a new set of disparities. But those disparities, reflecting a line-drawing effort, will exist whenever Congress enacts a new law changing sentences (unless Congress intends reopening sentencing proceedings concluded prior to a new law’s effective date). We have explained how in federal sentencing the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced. Supra, at 275; compare 18 U.S.C. § 3553(a)(4)(A)(ii) with § 3582(c). And we have explained how, here, continued application of the old 1986 *281 Drug Act mínimums to those pre-Act offenders sentenced after August 3 would make matters worse. Supra, at 276-279. We consequently conclude that this particular new disparity (between those pre-Act offenders already sentenced and those not yet sentenced as of August 3) cannot make a critical difference.
For these reasons considered as a whole, we conclude that Congress intended the Fair Sentencing Act’s new, lower mandatory mínimums to apply to the post-Act sentencing of pre-Act offenders. That is the Act’s “plain import” or “fair implication.”
B
We add one final point. Several arguments we have discussed involve the language of statutes that determine how new Guidelines take effect. Supra, at 275-276. What about those who committed an offense prior to August 3 and were sentenced after August 3 but before November 1, 2010—a period after the new Act’s effective date but before the new Guidelines first took effect? Do the Fair Sentencing Act’s new mandatory mínimums apply to them?
In our view, the new Act’s lower mínimums apply to them as well. Our reason is that the statute simply instructs the Commission to promulgate new Guidelines “as soon as practicable” (but no later than 90 days after the Act took effect). § 8(1), 124 Stat. 2374. As far as Congress was concerned, the Commission might have (having prepared new Guidelines in advance) promulgated those Guidelines within a few days—perhaps on August 3 itself. At the same time, the Commission possesses ample authority to permit appropriate adjustments to be made in the Guidelines sentences of those sentenced after August 3 but prior to the new Guidelines promulgation. See 28 U. S. C. § 994(u) (power to make Guidelines reductions retroactive); 76 Fed. Reg. 41333-41334 (2011) (amended 18-to-l Guidelines made retroactive). In any event, courts, treating the Guidelines as advisory, pos *282 sess authority to sentence in accordance with the new mínimums.
For these reasons, if the Fair Sentencing Act’s new míni-mums apply to all of those sentenced after August 3, 2010 (even if the new Guidelines were not yet ready), it is possible to foresee a reasonably smooth transition. On the other hand, it is difficult to foresee such a transition if the new Act’s application is keyed to a later date, thereby leaving the courts unable to take the new Act fully into account, particularly when that circumstance might create additional disparities and uncertainties that courts and the Commission may be helpless to correct. We have no reason to believe Congress would have wanted to impose an unforeseeable, potentially complex application date.
* * *
We vacate the Court of Appeals’ judgments and remand these cases for further proceedings consistent with this opinion.

It is so ordered.

APPENDIXES
A
Act of Feb. 25, 1871, § 4, 16 Stat. 432, 1 U. S. C. § 109:
“Repeal of statutes as affecting existing liabilities
“The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.”
Sentencing Reform Act of 1984, 18 U. S. C. § 3553(a)(4)(A)(ii):
“Imposition of a sentence
*283 “ . . . Factors To Be Considered in Imposing a Sentence. ... The court, in determining the particular sentence to be imposed, shall consider ...
[[Image here]]
“the kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...
[[Image here]]
“that. . . are in effect on the date the defendant is sentenced . . .
Fair Sentencing Act of 2010, § 8, 124 Stat. 2374:
“EMERGENCY AUTHORITY FOR UNITED STATES SENTENCING COMMISSION
“The United States Sentencing Commission shall—
“(1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act, in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987 (28 U. S. C. [§] 994 note), as though the authority under that Act had not expired; and
“(2) pursuant to the emergency authority provided under paragraph (1), make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.”
B
The following chart shows the sentencing scheme that would result for first-time pre-Act crack offenders if the 1986 Drug Act’s old 100-to-l mandatory minimums remain in effect after the Fair Sentencing Act’s new 18-to-l Guidelines *284 became effective. 21 U. S. C. §§ 841(b)(1)(A)-(C) (2006 ed.); USSG §§ 2D1.1(c), 5G1.1(b) (Nov. 2011).

1986 Drug Act Mínimums and Fair Sentencing Act Guidelines for Category I Offenders With No Prior Drug Felonies

[[Image here]]
The chart illustrates the disproportionate sentences that such a scheme would create. See supra, at 278-279. For one thing, it would create sentencing “cliffs” at the 1986 Drug Act’s old triggering amounts of 5 grams and 50 grams (where the old mínimums would entirely trump the new Guidelines), resulting in radically different Guidelines sentences for small differences in quantity. For another, because of those “cliffs,” the scheme would create similar Guidelines sen *285 tences for offenders who dealt in radically different amounts of crack, e. g., 50 grams versus 500 grams.
To be sure, as amicus points out, Congress has provided two mechanisms through which an offender may escape an otherwise applicable mandatory minimum, diminishing this problem for some offenders. First, an offender may escape a minimum by providing substantial assistance in the investigation or prosecution of another person. 18 U. S. C. § 3553(e); Fed. Rule Crim. Proc. 35(b); see also 28 U. S. C. § 994(n); USSG § 5K1.1. Second, under 18 U. S. C. § 3553(f), drug offenders who have little or no criminal history and who satisfy other requirements in the provision may obtain “safety valve” relief. See also USSG § 5C1.2. And because of these mechanisms a substantial portion of first-time offenders are relieved of application of a mandatory minimum. However, offenders with a criminal history category of II or higher are ineligible for “safety valve” relief; they escape application of a minimum at a much lower percentage. See 2011 Report 193 (Table 8-8).

Crack Offender Categories by Application of 1986 Drug Act Mandatory Min. (FY 2010)

[[Image here]]
*286 Yet similar sentencing anomalies would result for repeat offenders if the 1986 Drug Act’s mínimums remain in effect after the Fair Sentencing Act’s Guidelines became effective. Take, for example, Category II offenders.

1986 Drug Act Mínimums and Fair Sentencing Act Guidelines for Category II Offenders With No Prior Drug Felonies

[[Image here]]
As the chart illustrates, for Category II offenders accountable for 5 to 22 grams of crack or for 50 to 195 grams, the 100-to-1 mínimums would entirely trump the 18-to-l Guidelines, *287 producing the same anomalies—dissimilar sentences for similar quantities and similar sentences for dissimilar quantities—described above.
In contrast, a scheme with the Pair Sentencing Act’s 18-to-1 minimums and new Guidelines produces the proportionality in sentencing that Congress intended in enacting the Sentencing Reform Act and the Fair Sentencing Act.

Fair Sentencing Act Minimums and Guidelines for Category II Offenders With No Prior Drug Felonies

[[Image here]]