This case demonstrates the problems associated with blind application of habitual offender laws by our sentencing courts. In this case, Willie J. Ellison, Jr., pled guilty to one count of possession with intent to distribute heroin and another count of possession with intent to distribute cocaine. According to the terms of the plea agreement, Mr. Ellison was advised that if he appeared for sentencing on September 22, 2010, and registered with the home incarceration office in the interim, he would receive two concurrent 15-year sentences as a second-felony offender. However, if Mr. Ellison failed to comply with the term of the plea deal, the State would file a habitual offender bill of information charging him as a fourth-felony offender and defendant would face a sentencing range of 50 years to life imprisonment, based on his three prior guilty pleas to possession of cocaine.
Mr. Ellison failed to register with the home incarceration office and failed to appear for sentencing on September 22, 2010. With respect to Mr. Ellison's failure to *569 appear, his counsel explained to the court that Mr. Ellison's infant daughter had undergone surgery and was only released from the hospital on the date he was required to appear in court. There is apparently documentation in the record to verify the child's hospitalization and surgery. See State v. Ellison , 2012 WL 6864439 (2012). Additionally, Mr. Ellison appeared before the sentencing court days later on September 28, 2010, and filed a motion to withdraw his guilty pleas. Upon denial of this motion, the sentencing court fulfilled its promise in the plea agreement and re-sentenced Mr. Ellison to 30 years imprisonment at hard labor on count one, with the first five years to be served without benefit of parole, probation, or suspension of sentence, and 20 years imprisonment on count two, with the first two years to be served without benefit of parole, probation, or suspension of sentence, and ordered that the sentence run consecutively.
Mr. Ellison appealed and those sentences were vacated. A lengthy and complex procedural history ensued. Over the course of almost eight years, Mr. Ellison has been re-sentenced at least five times, resulting from numerous appeals by either him or the State.[1] After much debate by the lower courts, Mr. Ellison was most recently re-sentenced as a fourth-felony offender to 50 years without benefit of parole, probation, or suspension of sentence on count one, and a concurrent sentence on count two of 15 years imprisonment, of which the first two years are without benefit of parole, probation, or suspension of sentence.
The majority now denies review of Mr. Ellison's writ application seeking review of his sentences, which were enhanced by 35 years simply because he failed to appear on a specific date almost 10 years ago when his daughter was hospitalized. For the following reasons, I would grant Mr. Ellison's writ application.
In my view, defendant's reason for not appearing, which was verified and in the record, was reasonable and should have been considered by the sentencing court. Habitual offender laws are designed to counter criminal recidivism and should be applied as a consequence for repeat offenses and not for failure to appear and other technical violations. Sentencing courts have broad discretion when applying these laws. Since previous felony convictions are a prerequisite for application of habitual offender laws, the nature and scope of previous convictions should be given great weight by the sentencing court. If the previous convictions are all non-violent offenses, then the sentencing court should use its broad discretion to apply penalties with leniency. Mr. Ellison's previous offenses are all non-violent drug offenses.
I have expressed my disagreement with the routine overuse of habitual offender proceedings by district attorneys. In my dissent in State v. Guidry , I explained:
The prosecuting attorneys in Orleans Parish routinely wield the Habitual Offender Law, both during pre-trial plea negotiations and, in the event that tactic fails to yield a guilty plea, after obtaining a conviction at trial, to secure the harsher punishment of even non-violent offenders.
The Pew Charitable Trusts have examined the Habitual Offender Law and its impact on Louisiana's incarceration *570 rate[2] and found the number of newly-sentenced defendants who have received substantially enhanced punishments under the law has more than doubled over the past 10 years.[3]
* * *
Although the law represents an important means of protecting public safety and punishing recidivism, this data reveals the unfortunate truth that the weightiest penalties are not being reserved for the most serious crimes or the most dangerous offenders, particularly in Orleans Parish. To the contrary, drug possession is the most common primary offense for newly-sentenced prisoners convicted under the Habitual Offender Law.[4] According to the Louisiana Legislative Auditor's Office, 78% of habitual offender convictions are for non-violent offenses, though some of those offenders may have had prior violent offenses.[5]
16-1412 (La. 3/15/17), 221 So.3d 815, 826-27 (J, dissenting).
Another mitigating factor that must be considered by the sentencing court is the nature of the previous convictions in contrast with the nature of the instant offense. As a matter of public policy, in America we now recognize in a nation stricken with individuals suffering from drug addictions, habitual offender laws should be cautiously applied when each of a defendant's previous felonies are drug offenses. Here, each of Mr. Ellison's previous felony convictions were for the same non-violent offense, possession of cocaine. While this Court cannot instruct the lower courts to apply leniency to handle all drug offenses when adjudicating defendants as habitual offenders, when the pattern of drug addiction is clear based on defendant's previous convictions the sentencing court should consider the long-term effect of whether harsher sentences would directly result in less drug use.
I have on numerous occasions pointed out the stark disparity that exists in the treatment of individuals addicted to opioids compared to those addicted to illicit substances, such as cocaine. As I explained at length in my dissent in State v. Jago :
A swift rise in opioid-related deaths has been portrayed as a public health crisis of epic proportions. In fact, President Donald Trump declared the epidemic a national public health emergency on October 26, 2017. While a new collective understanding has emerged acknowledging drug addiction, particularly opioid abuse, as an illness best addressed by our public health institutions *571 rather than our criminal justice system, this new collective understanding only relates to one category of drug addiction.
When we declared a War on Drugs in the 1980's and 1990's, lawmakers eschewed compassion and reason, painting a distorted picture of certain drug abusers as violent criminals deserving of long prison sentences, rather than treatment. Prior to the Fair Sentencing Act (FSA) of 2010, the sentencing disparity between offenses for crack and powder cocaine was 100:1. See Dorsey v. United States , 567 U.S. 260, 264, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012). Interestingly, crack addiction largely affected poor communities of color, while powder cocaine predominantly impacted more affluent white communities. The current opioid crisis, however, casts a much broader demographic net. Many opioid abusers use legally prescribed medication, yet others are addicted to unlawfully obtained heroin. Indeed, over forty states across the nation, including Louisiana, have made opioid antagonists such as naloxone available over the counter at drugstores such as CVS and Walgreens. The fact remains, however, that opioids killed more than 33,000 people in 2015, and nearly half of those deaths were caused by a prescription opioid.[6] In my view, it is inconceivable to categorize one class of opioid abusers as ill and in need of treatment, while others are prosecuted to the full extent of the law.
* * *
To be clear, I embrace the notion that drug treatment should be the primary tool used to solve addictions. I have long advocated for reform in our criminal justice system and have actively participated in the Louisiana Justice Reinvestment Task Force, which successfully passed ten bills designed to reduce penalties for drug offenses and other non-violent offenses, while investing in substance abuse treatment and counseling programs.[7] Equal protection requires that we change our approach in handling addictions. We must not continue this pattern of relegating one group of drug abusers to prison, while providing medical assistance for some opioid abusers.
17-0183 (La. 11/17/17), 228 So.3d 1218, 1219-20 (J, dissenting). See also , State ex rel. Causey v. State , 16-1909 (La. 3/2/18), 237 So.3d 508, 510 (J, dissenting).
By denying review of this case, this Court has effectively ignored a systematic issue that burdens defendants and citizens of this State alike. In my view, we would reduce Louisiana's prison population substantially if drug dependency was treated as an addiction rather than soley in a criminal context. See State v. James , 15-2059 (La. 1/9/17), 208 So.3d 876 (J, dissenting). According to the Louisiana Department of Corrections, the average cost to house an inmate is approximately $60/day, which equates to approximately $22,000/year. The Louisiana Legislative Auditor concluded in fiscal year 2015, Louisiana spent over $680 million on incarceration, *572 an increase of more than $25 million over the prior year.[8] Continued abuse of habitual offender laws to impose long sentences on drug abusers serves only to exacerbate this already unsustainable burden that Louisiana taxpayers have been forced to shoulder to incarcerate more offenders than any other state, per capita.
In this case, imposition of an enhanced, excessive sentence on this non-violent offender who clearly suffers from a drug addiction which motivated his involvement in the activity for which he has been convicted, does not serve the purposes of protecting public safety and punishing recidivism.
For these reasons, I would grant defendant's writ application.
By his conduct, this defendant has earned a substantial hard labor sentence. However, in my view, the sentence of 50 years hard labor of this defendant as a multiple offender is unconstitutionally excessive. I agree with Chief Justice Johnson here that use of the Habitual Offender Law by prosecutors should be cautiously exercised with reasonable discretion, as I have repeatedly stated. State v. Guidry , 2016-1412 (La. 3/15/17), 221 So.3d 815, 831 (Crichton, J., additionally concurring) ("[T]he abusive frequency with which a de minimis number of jurisdictions invoke habitual offender laws against non-violent actors appears to do little to protect the people of Louisiana, and depletes the already scarce fiscal resources of this state"); State v. Hickman , 2017-0142 (La. 9/29/17), 227 So.3d 246, 247, reconsideration not considered , 2017-0142 (La. 11/28/17), 230 So.3d 224 (Crichton, J., additionally concurring) ("Complying with La. C.Cr.P. art. 894.1(C) and under an appropriate set of facts, I believe a trial court can impose a downward departure for certain non-violent offenses."); State v. Hagans , 2016-0103 (La. 10/17/16), 202 So.3d 475 ("In my view, the fact that a district attorney can file a habitual offender bill of information does not mean that in every case he should do so..."); State v. Ladd , 2014-1611 (La. 3/27/15), 164 So.3d 184 (Knoll, J., additionally concurring and Crichton, J., additionally concurring for the reasons assigned by Justice Knoll) ("In view of the defendant's non-violent criminal record and the sentencing court's imposition of twenty years without the benefit of parole, probation, or suspension of sentence under the Habitual Offender Law, this sentence on its face seems very harsh.").
This defendant has three previous cocaine possession convictions and no - zero - convictions of a crime of violence. In my view, the 50-year sentence is excessive and inhumane, extremely expensive to taxpayers of this state and, under the specific circumstances underlying this matter, retaliatory. Accordingly, I would grant the defendant's writ, vacate the sentence, and remand the matter to the trial court for re-sentencing.

An account of Mr. Ellison's procedural history can be found in State v. Ellison , 17-0319 (La. App. 5 Cir. 12/13/17), 234 So.3d 217.

The study was conducted in accordance with House Bill 82 of the 2016 Legislative Session convening the Justice Reinvestment Task Force. The Task Force has been charged to analyze the drivers of the state's prison population. Surveying 10 years of data from the Department of Corrections and Public Safety, Pew has concluded that offenders sentenced under the habitual offender law represent a small yet growing share of prison admissions. See Pew Charitable Trusts, Louisiana Data Analysis Part II: Prison Trends Cont. (September 23, 2016) (citing Department of Corrections data from 2006-15).

While in 2006, 157 prisoners faced enhanced punishment under the law, the number of defendants sentenced as recidivists had risen to 365 by 2015. Id.

2015 Department of Corrections data shows that nearly three quarters of habitual offender admissions have a primary drug or property offense, while just 14% have a violent primary offense, with 10% being defined as other.

Louisiana Legislative Auditor, Evaluation of Strategies to Reduce Louisiana's Incarceration Rate and Costs for Nonviolent Offenders (Aug. 31, 2016), available online as of October 26, 2018 at https://app.lla.state.la.us/PublicReports.nsf/DB26F2309F9783F2862580200077A2CD/$FILE/00010B73.pdf.

In 2016, 63,632 drug overdose deaths occurred in the United States. The age-adjusted rate of overdose deaths increased significantly by 21.5% from 2015 (16.3 (per 100,000) to 2016 (19.8 per 100,000). Opioids-prescription and illicit-are currently the main driver of drug overdose deaths. Opioids were involved in 42,249 overdose deaths in 2016 (66.4% of all drug overdose deaths). Opioid Overdose, Centers for Disease Control and Prevention Website, https://www.cdc.gov/drugoverdose/index.html (last visited October 26, 2018).

Louisiana Justice Reinvestment Task Force Report and Recommendations, March 16, 2017; https://www.lasc.org/documents/LA_Task_Force_Report_2017_FINAL.pdf

See n. 5, supra .