RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

          *v.*

CORNELIUS DEMORRIS BLEWETT (12-5226)
and JARREOUS JAMONE BLEWITT (12-5582),
          *Defendants-Appellants.*

Nos. 12-5226/5582

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:04-cr-36—Joseph H. McKinley, Jr., Chief District Judge.

Decided and Filed: May 17, 2013

Before: MERRITT, MARTIN, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Jamie L. Haworth, Frank W. Heft, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Louisville, Kentucky, for Appellant in 12-5226. Laura R. Wyrosdick, Frank W. Heft, Jr., OFFICE OF THE FEDERAL PUBLIC DEFENDER, Louisville, Kentucky, for Appellant in 12-5582. Candace G. Hill, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.

MERRITT, J., delivered the opinion of the court in which MARTIN, J., joined. GILMAN, J. (pp. 18–23), delivered a separate dissent.

_____

## OPINION

_____

MERRITT, Circuit Judge. This is a crack cocaine case brought by two currently incarcerated defendants seeking retroactive relief from racially discriminatory mandatory minimum sentences imposed on them in 2005. The Fair Sentencing Act was passed in August 2010 to "restore fairness to Federal cocaine sentencing" laws that had unfairly

impacted blacks for almost 25 years. The Fair Sentencing Act repealed portions of the Anti-Drug Abuse Act of 1986 that instituted a 100-to-1 ratio between crack and powder cocaine, treating one gram of crack as equivalent to 100 grams of powder cocaine for sentencing purposes. The 100-to-1 ratio had long been acknowledged by many in the legal system to be unjustified and adopted without empirical support. The Fair Sentencing Act lowered the ratio to a more lenient 18-to-1 ratio. However, thousands of inmates, most black, languish in prison under the old, discredited ratio because the Fair Sentencing Act was not made explicitly retroactive by Congress.

In this case, we hold, *inter alia*, that the federal judicial perpetuation of the racially discriminatory mandatory minimum crack sentences for those defendants sentenced under the old crack sentencing law, as the government advocates, would violate the Equal Protection Clause, as incorporated into the Fifth Amendment by the doctrine of *Bolling v. Sharpe*, 347 U.S. 497 (1954) (Fifth Amendment forbids federal racial discrimination in the same way as the Fourteenth Amendment forbids state racial discrimination). As Professor William J. Stuntz, the late Harvard criminal law professor, has observed, "persistent bias occurred with respect to the contemporary enforcement of drug laws where, in the 1990s and early 2000s, blacks constituted a minority of regular users of crack cocaine but more than 80 percent of crack defendants." *The Collapse of American Criminal Justice* 184 (2011). He recommended that we "redress that discrimination" with "the underused concept of 'equal protection of the laws.'" *Id*. at 297.

In this opinion, we will set out both the constitutional and statutory reasons the old, racially discriminatory crack sentencing law must now be set aside in favor of the new sentencing law enacted by Congress as the Fair Sentencing Act of 2010. The Act should apply to all defendants, including those sentenced prior to its passage. We therefore reverse the judgment of the district court and remand for resentencing.

## I.

The district court judge, bound by unavoidable mandatory minimums, sentenced the Blewett[1] cousins in 2005 to a mandatory minimum of ten years each under the old 100-to-1 crack cocaine law, sentences based on the quantity of crack cocaine possessed. The Blewetts seek retroactive resentencing under 18 U.S.C § 3582(c)(2)[2] and 28 U.S.C. § 994(u)[3] because the Fair Sentencing Act of 2010, P.L. No. 111-220, 124 Stat. 2372, as implemented by new sentencing guidelines, has substantially reduced crack cocaine sentences, including the mandatory minimum sentences imposed in this case. *See* 21 U.S.C. § 841(b) (increasing the amount of crack from 50 grams to 280 grams to trigger the 10-year mandatory minimum and from 5 grams to 28 grams to trigger the five-year mandatory minimum). If the Blewetts were sentenced today under the revised crack law, they would not be subject to a statutory minimum because the quantity of crack involved falls below the threshold for any statutory minimum.

The old 100-to-1 crack cocaine ratio has led to the mass incarceration of thousands of nonviolent prisoners under a law widely acknowledged as racially discriminatory. There were approximately 30,000 federal prisoners (about 15 percent of all federal prisoners) serving crack cocaine sentences in 2011. United States Sent'g Comm'n, Analysis of the Impact of Guideline Implementation of the Fair Sentencing

---

[1]Although Cornelius and Jarreous spell their last names differently, we will use the "Blewett" spelling in this opinion for ease of reference.

[2]18 U.S.C. § 3582(c)(2) provides in relevant part:

in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), . . . the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

[3]This statute provides:

If the Commission reduces the term of imprisonment recommended in the guidelines applicable to a particular offense or category of offenses, it shall specify in what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for the offense may be reduced.

Act of 2010 if the Amendment Were Applied Retroactively, at 12 (May 2011).[4] Thousands of these prisoners are incarcerated for life or for 20, 10, or 5 years under mandatory minimum crack cocaine sentences imposed prior to the passage of the Fair Sentencing Act.  More than 80 percent of federal prisoners serving crack cocaine sentences are black.  *See, e.g.*, United States Sent'g Comm'n, Annual Report 2011 at 37 (83%); United States Sent'g Comm'n, 1996 Sourcebook of Federal Sentencing Statistics tbl.29, at 47 (85.8%).  In fiscal year 2010, before the passage of the Fair Sentencing Act, almost 4,000 defendants, mainly black, received mandatory minimum sentences for crack cocaine.  United States Sent'g Comm'n, 2010 Sourcebook of Federal Sentencing Statistics tbl.43.

In 2010, recognizing the statistical evidence of widespread racial discrimination based on empirical studies, Congress passed the Fair Sentencing Act. The preamble to the Fair Sentencing Act, recognizing racial injustice, states that it is designed "to restore fairness to Federal cocaine sentencing."  Justice Breyer's majority opinion in *Dorsey v. United States*, 132 S. Ct. 2321, 2328 (2012), states that the new law was adopted "because the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences."  The Chairman of the Judiciary Committee, Senator Patrick Leahy, reflecting on the purpose of the new Act, stated that the former 100-to-1 ratio law is "one of the most notorious symbols of racial discrimination in the modern criminal justice system."  156 Cong. Rec. S1683 (daily ed. Mar. 17, 2010).  Many members of Congress stated that the old law should be changed because it was racially discriminatory and not based on any coherent rationale.[5]

---

[4] All the Sentencing Commission publications cited herein are available on the Commission's website (www.ussc.gov).

[5] Here is a representative sample of statements by members of Congress concerning the purpose of the Fair Sentencing Act:

> 155 Cong. Rec. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Dick Durbin, Assistant Senate Majority Leader) ("Vice President Joe Biden, one of the authors of the legislation creating this disparity in sentencing, has said:  'Each of the myths upon which we based the disparity has since been dispelled or altered.'"); 156 Cong. Rec. H6202 (daily ed. July 28, 2010) (statement of Rep. Robert C. "Bobby" Scott, Chairman of the House Judiciary Subcommittee on Crime, Terrorism and Homeland Security) ("We are not blaming anybody for what happened in 1986, but we have had years of experience and have determined that there is no justification for the 100-to-1 ratio.");

Yet, despite the passage of the Act and the Supreme Court's condemnation of the 100-to-1 ratio in *Dorsey*, more than 17,000 such crack prisoners sentenced under the old, racially discriminatory law are not eligible for resentencing. The majority of these people, the government claims, cannot benefit from the new law because they received a sentence under the old mandatory minimums or received a career offender designation (requiring two previous drug convictions). So according to figures supplied by the Sentencing Commission, less than one-half of those given excessive, racially discriminatory sentences, like the ones imposed on the Blewetts, are eligible for relief. United States Sent'g Comm'n, Analysis of the Impact of Guideline Implementation of the Fair Sentencing Act of 2010 if the Amendment Were Applied Retroactively, at 12 (May 2011).

Congress, as Justice Breyer's opinion in *Dorsey* confirmed, intended in the Fair Sentencing Act to repeal and redress the wrongs of the older crack sentencing statute that Congress believed had proven itself to be arbitrary, irrational, and racially discriminatory. The *status quo* has now been overturned. The question remaining is: how retroactive is the new law? Fully? Or only partially, just covering a minority of those wrongly sentenced?

The answer to the question turns on our interpretation of principles of equal protection and several interlocking rules, provisions of sentencing law, including background canons of statutory interpretation, the Fair Sentencing Act, the previous statutes it repealed or modified, and the sentencing guideline provisions propagated pursuant to it. We regard as the most important consideration the clear congressional

---

156 Cong. Rec. H6202 (daily ed. July 28, 2010) (Statement of Rep. Daniel E. Lungren) ("We initially came out of committee with a 20-to-1 ratio. By the time we finished on the floor, it was 100-to-1. We didn't really have an evidentiary basis for it, but that's what we did, thinking we were doing the right thing at the time.");156 Cong. Rec. S1682 (daily ed. Mar. 17, 2010) (statement of Sen. Patrick Leahy) ("The racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution's promise of equal treatment for all Americans."); 156 Cong. Rec. H6198 (daily ed. July 28, 2010) (statement of Rep. James E. Clyburn, House Majority Whip) ("The current drug sentencing policy is the single greatest cause of the record levels of incarceration in our country. One in every 31 Americans is in prison or on parole or on probation, including one in 11 African Americans. This is unjust and runs contrary to our fundamental principles of equal protection under the law."); 156 Cong. Rec. H6203 (daily ed. July 28, 2010) (statement of Rep. Steny Hoyer) ("The 100-to-1 disparity is counterproductive and unjust.").

purpose to end the long, racially discriminatory sentences imposed in crack cocaine cases over the past 25 years and the fact that the perpetuation of such sentences is unconstitutional.[6]

## II.

We readily acknowledge that no party challenges the constitutionality of denying retroactive application of the Fair Sentencing Act to people who were sentenced under the old regime. That does not mean, however, that the constitutional question is irrelevant as we determine whether the Blewetts are entitled to a sentence reduction. That is because we are constrained to interpret statutes and sentencing guidelines so as to avoid potential conflict with the Constitution. The constitutional-doubt canon means that a statute or other authoritative text should be interpreted in a way that avoids creating an unconstitutional law or placing its constitutionality in doubt. The most recent treatise on the subject of canons of construction quotes a statement defining the meaning of the constitutional-doubt canon found in *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909): "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 247 (2012). The interpretation the government puts forth to deny retroactive application of the Fair Sentencing Act would result in a violation of equal protection.

---

[6]Like passing a foreign ship at night with an "ahoy," our dissenting colleague starts with a poetic metaphor about "setting sail . . . without any legal ballast." The dissent then refuses to acknowledge, come to grips with or rebut the equal protection argument in this case. The dissent fails even to acknowledge the language of the Supreme Court in *Dorsey* stating that Congress found the old 100-to-1 ratio to be racially discriminatory and therefore reduced the penalty to 18-to-1. Nor does the dissent acknowledge or rebut the many legislative history statements that the law the dissent would continue to apply is blatantly racially discriminatory. The dissent only cites *United States v. Hammond*, No. 12-5522, 2013 WL 1363908 (6th Cir. Apr. 5, 2013), as authority. The *Hammond* case does not purport to deal with the equal protection problem. A dissent that refuses to acknowledge the main problem in a case and then relies primarily on a case that does not mention the problem is not responsive or relevant. In order to be responsive, disagreement at least requires a discussion about why we should continue to hold thousands of people in jail who are there because of a law that is acknowledged to be racially discriminatory by a majority of the Supreme Court and by the vote of a large majority of the Congress of the United States. Congress does not often acknowledge that it passed a racially discriminatory law and then try to redress its own prior mistake. To be relevant, a dissent must at least try to deal with that issue.

Quite apart from the legal doctrine that guides the Equal Protection Clause (as incorporated into the Due Process Clause of the Fifth Amendment), the discriminatory nature of prior crack sentences is no longer a point of legitimate debate. The racially discriminatory impact of the 100:1 sentencing scheme surfaced early on when statistics showed that nearly one hundred percent of all crack defendants were non-white. *See* United States Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics tbl.34 (94% nonwhite); LaJuana Davis, *Rock, Powder, Sentencing—Making Disparate Impact Evidence Relevant in Crack Cocaine Sentencing*, 14 J. Gender Race & Just. 375, 386-88 & n.68 (2011). From 1988 to 1995, federal prosecutors prosecuted no whites under the crack provisions in 17 states, including major cities such as Boston, Denver, Chicago, Miami, Dallas, and Los Angeles. Dan Weikel, *War on Crack Targets Minorities over Whites*, L.A. Times, May 21, 1995, http://articles.latimes.com/1995-05-21/news/mn-4468_1_crack-cocaine. These alarming numbers are not unlike the Supreme Court's early cases of facially neutral laws creating an overwhelmingly disparate result. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

The Sentencing Commission and the Supreme Court recognized the disparity as well. In the 1990s, the Supreme Court first recognized the discriminatory impact of the 100:1 ratio. *United States v. Armstrong*, 517 U.S. 456, 479 (1996) (Stevens, J., dissenting) ("[I]t is undisputed that the brunt of the elevated federal penalties falls heavily on blacks."). In a 1995 report to Congress, the Sentencing Commission said, "The 100-to-1 crack cocaine to powder cocaine quantity ratio is a primary cause of the growing disparity between sentences for Black and White federal defendants." United States Sent'g Comm'n, Special Report to the Congress: Cocaine and Federal Sentencing Policy, at Chapter 7D (Feb. 1995). In 1995, the Commission submitted to Congress an amendment to the sentencing guidelines that would have equalized penalties between crack and powder cocaine. Congress rejected the recommendation. In 1997, the Commission unanimously recommended that Congress lower the 100-to 1 ratio and gave Congress several options to adjust the disparity between crack and powder cocaine penalties. *See* United States Sent'g Comm'n, Special Report to the Congress: Cocaine and Federal Sentencing Policy (Apr. 1997). Congress took no action on the

recommendations.    In 2002, the Commission again "unanimously and firmly" recommended to Congress that the drug quantity ratio between crack and powder cocaine be reduced.  United States Sent'g Comm'n, Report to the Congress: Cocaine and Federal Sentencing Policy viii (May 2002).  While the Sentencing Commission adjusted the guideline ranges for crack cocaine in 2007 in Amendment 706 to decrease the length of sentences, Congress made no changes to the 100-to-1 ratio to adjust the mandatory minimums for crack cocaine until it passed the Fair Sentencing Act in 2010.  Hence thousands of black defendants now remain in federal prisons under long sentences, some for life.

In view of the statistical facts and the widespread congressional consensus leading to the adoption of the Fair Sentencing Act's remedial provisions, there can be no doubt that the old crack law was racially discriminatory in effect.  As a matter of legal doctrine, there is no equal protection violation without discriminatory intent.  *See Washington v. Davis*, 426 U.S. 229 (1976).  When the old 100-to-1 crack cocaine statute was adopted, it presumably did not violate the Equal Protection Clause because there was no intent or design to discriminate on a racial basis.  Its adoption was simply a mistake.  Since 1986, however, we have gained knowledge of the old statute's devastating effect on blacks.  Congress itself acknowledged this problem by enacting the Fair Sentencing Act.

The Fair Sentencing Act was a step forward, but it did not finish the job.  The racial discrimination continues by virtue of a web of statutes, sentencing guidelines, and court cases that maintain the harsh provisions for those defendants sentenced before the Fair Sentencing Act.  If we continue now with a construction of the statute that perpetuates the discrimination, there is no longer any defense that the discrimination is unintentional.  The discriminatory nature of the old sentencing regime is so obvious that it cannot seriously be argued that race does not play a role in the failure to retroactively apply the Fair Sentencing Act.  A "disparate impact" case now becomes an intentional subjugation or discriminatory purpose case.  Like slavery and Jim Crow laws, the intentional maintenance of discriminatory sentences is a denial of equal protection.

This analysis is undermined by neither *McCleskey v. Kemp*, 481 U.S. 279 (1987), nor *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), two cases that on first glance might appear to sanction the discrimination at issue here. In *McCleskey*, the Supreme Court held that a detailed study showing racial disparity in the application of Georgia's death penalty could not make out intentional discrimination. Statistical proof of discriminatory application was not enough; McCleskey was required to "prove that the Georgia Legislature enacted or maintained the death penalty statute *because of* an anticipated racially discriminatory effect." *McCleskey*, 481 U.S. at 298. Here Congress enacted the new law to remedy racial discrimination. *McCleskey*'s disapproval of statistical evidence is also distinguishable. *McCleskey* was obviously concerned to preserve a system of criminal enforcement where multiple decisionmakers were involved and where each decision to impose the death penalty required assessment of the individual defendant's unique personal, mitigating characteristics. *See id.* at 292–97. But in the context of crack cocaine sentencing, the defendant's independent characteristics do not factor into the equation, and the decisionmaker's choice is a discretionless mandatory minimum. In the general course of things, the prosecutor will charge based on an objectively verifiable quantity of crack, and the court will impose a sentence no lower than that mandated by Congress. *See* David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 Stan. L. Rev. 1283, 1316-18 (1995).

*Feeney* dealt with a state law that gave hiring preference in civil service positions to veterans. Because the overwhelming majority of veterans were male, the practical effect of the law was to deprive better qualified women of job opportunities. The Court found that the plaintiff had not shown any purpose to discriminate against women. Discriminatory purpose, it was held, "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (citation omitted). *Feeney*, however, makes it clear that racial discrimination, "regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Id.* at 272. There is overwhelming and

unavoidable proof that the continued application of the old crack law keeps blacks in jail at a discriminatory rate. This proof supports an inference that the old crack laws have been maintained at least in part because of their discriminatory effects. The Supreme Court in *Dorsey*,[7] the legislative history of the Fair Sentencing Act, and the United States Sentencing Commission in various special reports to Congress have all explicitly advised that the old mandatory minimums are racially discriminatory. Obviously, this court should not place a meaning on the new statute and guidelines that would perpetuate proven racial discrimination and thereby violate equal protection. There is no excuse for judges to engage in perpetuating such discrimination or to sanction it by refusing to correct it.

The role of the judge is especially important here. A host of precedents, from 1880 forward, forbid judicial perpetuation of racial discrimination. In striking down the behavior of a Virginia judge in refusing to call blacks as grand or petit jurors in 1878, the Supreme Court denied the plea of the attorney general of Virginia to allow such judicial conduct. Relying on the Fourteenth Amendment, as well as an act of Congress prohibiting such discrimination, the court refused to permit this practice. "It is idle," the Court said, "to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action." *Ex parte Virginia*, 100 U.S. 339, 348-49 (1880). Judges, both state and federal, must comply with the principles of equal protection found in the Fourteenth Amendment. Likewise, in striking down racially restrictive covenants judicially enforced by courts, the Supreme Court explained that judicial perpetuation of discrimination is not immunized from equal protection principles:

> The difference between judicial enforcement and non-enforcement of the restrictive covenants is the difference to petitioners between being denied rights of property available to other members of the community and being accorded full enjoyment of those rights on an equal footing

---

[7] *See* 132 S. Ct. 2321, 2328 (2012) (stating that the new law was adopted "because the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences").

. . . . State action, as that phrase is understood for the purposes of the
Fourteenth Amendment, refers to exertions of state power in all forms.

*Shelly v. Kraemer*, 334 U.S. 1, 19-20 (1948).  The Supreme Court has invalidated the
judicial perpetuation of racial discrimination through the failure of courts to allow
custody awards of white children to mixed-race parents. *See Palmore v. Sidoti*, 466 U.S.
429, 433 (1984) ("The Constitution cannot control such prejudices but neither can it
tolerate them.  Private biases may be outside the reach of the law, but the law cannot,
directly or indirectly, give them effect.").  The entire body of school desegregation cases
condemning as discriminatory the perpetuation of racial segregation in the assignment
of students or teachers leads us to the same conclusion about the judge's role. *See, e.g.*,
*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971) ("[A] school
desegregation case does not differ fundamentally from other cases involving the framing
of equitable remedies to repair the denial of a constitutional right. The task is to correct,
by a balancing of the individual and collective interests, the condition that offends the
Constitution.").  In short, the principle that judges may not enforce obvious racial
discrimination—and indeed, are duty-bound within their powers to ensure that it does
not occur—is time-honored in our law.

The remedy is straightforward and relatively simple.  The Fair Sentencing Act
and the new retroactive Sentencing Guidelines subsequently adopted by the Sentencing
Commission can and should be interpreted to replace retroactively the old,
discriminatory mandatory minimums with the new, more lenient minimums.  It is our
duty under the constitutional-doubt canon of statutory construction.   The Equal
Protection Clause requires us to alter what Senator Leahy called "one of the most
notorious symbols of racial discrimination in the modern criminal justice system" and
an "imbalance that . . . disparages the Constitution's promise of equal treatment for all
Americans." *See supra*, at 5 & n.5.  In light of our new knowledge about the racial
discrimination inherent in the old law, inertia and judicial instinct to avoid change and
maintain the *status quo* should no longer protect the old sentences.  We should not allow

the government's legalisms to undermine the purpose of the Fair Sentencing Act and its more lenient punishment system for crack cocaine.[8]

### III.

Laying aside the equal protection basis for revising the old mandatory minimums, the Sentencing Guidelines themselves call for such a construction.

The government, ignoring the equal protection violation, relies on a purely technical argument. The government provides no convincing reason why ordinary guideline sentences and "mandatory minimum" sentences should be treated differently.[9] The government's argument is that mandatory minimum sentences are "final" and should not be disturbed or set aside under § 3582(c)(2), even though the Sentencing Commission has retroactively changed other crack sentences under the old 100-to-1 ratio. It claims that the Sentencing Commission itself has made a distinction between long mandatory minimum sentences, which it wishes to retain, and other crack sentences.

The mechanism by which Congress sought to reduce crack cocaine sentences was simply to reduce the excessive 100-to-1 ratio it had spelled out in earlier drug statutes, a method recommended by the Sentencing Commission. The Supreme Court in *Dorsey* explains the process:

> In 2010, Congress accepted the Commission's recommendations . . . and enacted the Fair Sentencing Act into law. The Act increased the drug amounts triggering mandatory minimums for crack trafficking offenses from 5 grams to 28 grams in respect to the 5-year minimum and from

---

[8]Other canons of statutory construction support retroactivity of the mandatory minimums as well. The Fair Sentencing Act is clearly a remedial statute and should therefore be liberally construed. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 476 (1793) (Jay, C.J.). Further, if there is a doubt under the interlocking texts of the statutory and guideline provisions or under the application notes or any amendment to the guidelines, the rule of lenity should apply. Under that rule, ambiguity should be resolved in the defendant's favor. *See United States v. Granderson*, 511 U.S. 39, 47-54 (1994); *Williams v. United States*, 458 U.S. 279, 290 (1982); *Bifulco v. United States*, 447 U.S. 381, 387 (1980).

[9]Mandatory minimum sentences generally remain widely criticized by the criminal justice literature, the federal judiciary, and the Sentencing Commission. The Commission identified mandatory minimums for drug offenses and the corresponding guidelines as "a primary cause of a widening gap between the average sentences of Black, White, and Hispanic offenders" in the guidelines era. United States Sent'g Comm'n, Fifteen Years of Guidelines Sentencing (2004).

> 50 grams to 280 grams in respect to the 10-year minimum (while leaving powder at 500 grams and 5,000 grams respectively). The change had the effect of lowering the 100-to-1 crack-to-powder ratio to 18-to-1.

132 S. Ct. at 2329 (citations omitted). The Sentencing Commission incorporated and integrated the new statutory minimums into its system by attempting to harmonize the new crack guidelines with the new mandatory minimums.

The government argues that the Fair Sentencing Act did not give retroactive effect to the old mandatory minimums like those imposed on the Blewetts because a mandatory minimum does not fit the language—"sentencing range that has subsequently been lowered by the Sentencing Commission"—used by Section 3582(c)(2). The government ignores the fact, however, that the guidelines range is entirely dependent on, not independent of, a statutory mandatory minimum or maximum. The mandatory minimums and maximums are an integral part of and gave rise to the sentencing guideline ranges. They are the most significant part because they provide the bookends: The mandatory minimum provides the floor of the range and the mandatory maximum provides the ceiling if a certain threshold quantity of crack is involved. The Sentencing Commission itself instructs judges to use the mandatory minimums in this manner. *See* § 5G1.1(b) ("the statutorily required minimum sentence shall be the guideline sentence").[10] For example, if a defendant's guideline range is 50-70 months with a statutory mandatory minimum of 60 months, the floor of the guideline range then elevates to 60 and the resulting guideline range is 60-70 months. The entire system of revised crack guidelines is therefore driven by the new mandatory minimums.

The Commission uses the new statutory minimums as the gravitational force around which the new system revolves. The statutory minimums are closely integrated into the structure of the revised guidelines. When the entire retroactive guideline process is based on the new congressional minimums, it makes no sense for the government to

---

[10] § 5G1.1(b) provides:

> (b)      Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence *shall be the guideline sentence*. (Emphasis added.)

argue that prisoners sentenced under the old crack guidelines should have their ordinary guideline sentences revised sharply downward retroactively to reflect the 18-to-1 ratio while leaving the prisoners sentenced under the old, now-repealed, statutory minimums languishing in prison under the 100-to-1 ratio. The new minimums ordered by the Fair Sentencing Act to be incorporated by the guidelines are no longer "statutory" only. They are just as much a part of the retroactive guidelines as other guidelines because they have been incorporated in the retroactive system. As the Third Circuit has observed, a contrary result "would not make sense" because the old minimums would "always trump the new Guidelines for the large number of defendants whose Guidelines ranges are [now] below the mandatory minimum," as in this case. *United States v. Dixon*, 648 F.3d 195, 201 (3d Cir. 2011) (defendant's offense committed prior to the Act, but sentenced after passage of the Act). Consistent policy requires that the new statutory minimums also be given retroactive effect.

The government's argument leads to the absurd result that the Blewetts would remain in prison for ten years when under the revised guidelines they are now subject to no minimum at all. Also absurd, the government's view of retroactivity would give major kingpins the greatest benefit of retroactivity because their amended guideline range is above the mandatory minimum while hundreds of more petty, less culpable offenders like the Blewetts remain in prison without any benefit of the revised law. This result perpetuates racial discrimination, defies the goal of consistency, creates a huge sentencing disparity in violation of the purpose of the Sentencing Reform Act of 1984, and does not eliminate the unfairness that Congress had in mind and that *Dorsey* points out as the reason the new guidelines are given retroactive treatment.

Further, section 3582(c)(2) on retroactivity dovetails with § 1B1.10 of the guidelines, which is called a "policy statement" covering "Reduction in Term of Imprisonment as a Result of Amended Guideline Range."[11] The government argues

---

[11]This entire guideline provides as follows:

**§1B1.10. Reduction in Term of Imprisonment as a Result of Amended Guideline Range  (Policy Statement)**

against providing redress by pointing not to the language of this guideline provision but to an "Application Note" on "Eligibility."  The government makes this argument in the face of the fact that the Sentencing Commission itself pointed out to Congress the racial discrimination that led to the change in the law.  The meaning of the Application Note is ambiguous:

---

**(a)** Authority. –

**(1)**  In General. – In a case in which a defendant is serving a term of imprisonment, and the guideline range applicable to that defendant has subsequently been lowered as a result of an amendment to the Guidelines Manual listed in subsection (c) below, the court  may reduce the defendant's term of imprisonment as provided by 18 U.S.C. 3582(c)(2).  As required  by 18 U.S.C. 3582(c)(2), any such reduction in the defendant's term of imprisonment shall be consistent with this policy statement.

**(2)** Exclusions. – A reduction in the defendant's term of imprisonment is not consistent with this policy statement and therefore is not authorized under 18 U.S.C. 3582(c)(2) if –

**(A)**  None of the amendments listed in subsection (c) is applicable to the defendant; or

**(B)**  An amendment listed in subsection (c) does not have the effect of lowering the defendant's applicable guideline range.

**(3)** Limitation. – Consistent with subsection (b), proceedings under 18 U.S.C. 3582(c)(2) and this policy statement do not constitute a full resentencing of the defendant.

**(b)**  Determination of Reduction in Term of Imprisonment.–

**(1)** In General. – In determining whether, and to what extent, a reduction in the defendant's term of imprisonment under 18 U.S.C. 3582(c)(2) and this policy statement is warranted, the court shall determine the amended guideline range that would have been applicable to the defendant if the amendment(s) to the guidelines listed in subsection (c) had been in effect at the time the defendant was sentenced.  In making such determination, the court shall substitute only the amendments listed in subsection (c) for the corresponding guideline  provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected.

**(2)** Limitation and Prohibition on Extent of Reduction.–

**(A)**  Limitation. – Except as provided in subdivision (B), the court shall not reduce the defendant's term of imprisonment under 18 U.S.C. 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range determined under subdivision (1) of this subsection.

**(B)** Exception for Substantial Assistance. – If the term of imprisonment imposed was less than the term of imprisonment provided by the guideline range applicable to the defendant at the time of sentencing pursuant to a government motion to reflect the defendant's substantial assistance to authorities, a reduction comparably less than the amended guideline range determined under subdivision (1) of this subsection may be appropriate.

**(C)** Prohibition. – In no event may the reduced term of imprisonment be less than the term  of imprisonment the defendant has already served.

**(c)**  Covered Amendments.—Amendments covered by this policy statement are listed in Appendix C as follows: 126, 130, 156, 176, 269, 329, 341, 371, 379, 380, 433,454, 461, 484, 488, 490, 499, 505, 506, 516, 591, 599, 606, 657, 702, 706 as amended by 711, 715, and 750 (parts A and C only).

(A)     Eligibility. — Eligibility for consideration under 18 U.S.C.
        § 3582(c)(2) is triggered only by an amendment listed in
        subsection (c) that lowers the applicable guideline range (*i.e.*, the
        guideline range that corresponds to the offense level and criminal
        history category determined pursuant to § 1B1.1(a), which is
        determined before consideration of any departure provision in the
        Guidelines Manual or any variance). Accordingly, a reduction in
        defendant's term of imprisonment is not authorized under 18
        U.S.C. § 3582(c)(2) and is not consistent with this policy
        statement if: (i) none of the amendments listed in subsection (c)
        is applicable to the defendant; or (ii) an amendment listed in
        subsection (c) is applicable to the defendant *but the amendment
        does not have the effect of lowering the defendant's applicable
        guideline range because of the operation of another guideline or
        statutory provision (e.g., a statutory mandatory minimum term of
        imprisonment).*

(Emphasis added.) The government argues that the old statutory minimums still "operate" as "another guideline or statutory provision" to prevent the lowering of the "applicable guideline range," even though these minimums have been repealed and the new minimums have been incorporated into the Commission's new crack guidelines. Why does the parenthetical phrase at the end of the Note — "e.g., a statutory mandatory minimum term of imprisonment" — refer to the old, discriminatory minimums instead of the new, more lenient ones that presumably are not racially discriminatory? The statutory minimums have been reduced and incorporated into the guidelines by the Sentencing Commission. The old, repealed discriminatory minimums are no longer a part "of the operation of" the sentencing system. They should not be used to foreclose "lowering the defendant's applicable guideline range." We should not presume that the Sentencing Commission would point out to Congress the racially discriminatory nature of the old crack guidelines, and request new mandatory minimums around which to rebuild the new retroactive guidelines, and then decide to retain the old crack minimums as the "guideline sentence" under §5G1.1(b).

## IV. Conclusion

The old crack cocaine statutory minimums are racially discriminatory as the legislative history of the Fair Sentencing Act makes clear, as the *Dorsey* case states, and

as the Sentencing Commission reports to Congress advise.  Perpetuation of such racially discriminatory sentences by federal courts is unconstitutional and therefore the sentencing guidelines must be interpreted to eliminate such a result.  Accordingly, the judgment of the district court is reversed and remanded for the resentencing of plaintiffs in accordance with this opinion.

—————————————

**DISSENT**

—————————————

**RONALD LEE GILMAN, Circuit Judge, dissenting**.  I fear that my panel colleagues have sua sponte set sail into the constitutional sea of equal protection without any legal ballast to keep their analysis afloat.  To start with, they "readily acknowledge that no party challenges the constitutionality of denying retroactive application of the Fair Sentencing Act to people who were sentenced under the old regime."  Maj. Op. 6.  Opining on this unbriefed and unargued issue is thus fraught with the likelihood of running aground on the shoals of uncharted territory.

They further concede that the law establishing the 100-to-1 ratio between powder cocaine and crack cocaine for sentencing purposes was constitutional when enacted:

> When the old 100-to-1 crack cocaine statute was adopted, it presumably did not violate the Equal Protection Clause because there was no intent or design to discriminate on a racial basis.  Its adoption was simply a mistake.

Maj. Op. 8.

So far, so good.  But then the majority veers off into the abyss with the following analysis:

> Since 1986, however, we have gained knowledge of the old statute's devastating effect on blacks. . . . The discriminatory nature of the old sentencing regime is so obvious that it cannot seriously be argued that race does not play a role in the failure to retroactively apply the Fair Sentencing Act.  A "disparate impact" case now becomes an intentional subjugation or discriminatory purpose case.  Like slavery and Jim Crow laws, the intentional maintenance of discriminatory sentences is a denial of equal protection.

*Id.* at 8-9.

The majority reaches this conclusion without citing a single case in support.  This is not due to a lack of diligent research; it is due to the lack of any such cases.  The best

the majority can do is try to distinguish two Supreme Court decisions (*McCleskey v. Kemp*, 481 U.S. 279 (1987), and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979)) that even the majority concedes "on first glance might appear to sanction the discrimination at issue here." Maj. Op. 9. Those efforts at distinguishing *McCleskey* and *Feeney* are in vain, however, because binding Sixth Circuit precedent has already foreclosed the majority's constitutional argument.

The majority reaches the issue of equal protection not directly, but through applying the "constitutional-doubt canon" of statutory construction (also known as "constitutional avoidance," *see Clark v. Martinez*, 543 U.S. 371, 384 (2005)). Maj. Op. 6. Two conditions are necessary before a court may invoke this interpretative canon: (1) the statute in question must be "susceptible of two constructions," and (2) one construction raises "grave and doubtful constitutional questions" that the other construction avoids. *Id.* (internal quotation marks omitted). The present case meets neither condition.

I start with the first condition. This court has already interpreted the Fair Sentencing Act as applied to dozens of defendants who, like the Blewetts, were convicted *and sentenced* prior to the effective date of the Act. *See, e.g.*, *United States v. Hammond*, — F.3d —, No. 12-5522, 2013 WL 1363908 (6th Cir. Apr. 5, 2013); *United States v. Hollins*, No. 12-5182, 2012 WL 5477119 (6th Cir. Nov. 13, 2012); *United States v. Downs*, 487 F. App'x 286 (6th Cir. 2012). In each of these decisions, this court has held that the Act is not retroactive to defendants who were convicted and sentenced before its effective date.

The majority therefore errs in employing the constitutional-avoidance canon to select a construction of the Act that is favorable to the Blewetts when this court has already chosen the contrary construction. *See Clark*, 543 U.S. at 385 ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*." (emphasis in original)). We are instead bound by *Hammond*, a prior reported decision that interprets the same statute

under the same factual circumstances as the present case. *See, e.g.*, *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." (internal quotation marks omitted)).

And even if *Hammond* were not fatal to the cause taken up by my colleagues, their resort to the constitutional-avoidance canon would still be flawed because this court has already answered any "grave and doubtful constitutional questions" raised by the continued application of the old crack-cocaine/powder-cocaine sentencing disparity. Over 20 years ago, this court held that "the one to one hundred ratio of crack to cocaine does not violate Equal Protection Standards." *United States v. Williams*, 962 F.2d 1218, 1227 (6th Cir. 1992).

Subsequent equal protection attacks on the crack/powder ratio have likewise been rejected. *See, e.g.*, *United States v. Reece*, 994 F.2d 277, 278 (6th Cir. 1993) (holding that the ratio's disparate impact "may not alone support a finding of invidious discrimination in a facially neutral law"); *United States v. Muse*, 250 F. App'x 700, 701-02 (6th Cir. 2007) (noting that the Sixth Circuit has already rejected equal protection arguments for invalidating the 100-to-1 ratio and that "[e]very court of appeals to address the issue has upheld the ratio in the face of similar constitutional challenges"). Just as *Hammond* resolves any doubt of statutory interpretation regarding the limited retroactivity of the Fair Sentencing Act, so do *Reece* and *Williams* resolve any doubt regarding the constitutionality of pre-Act sentences that the Act leaves intact. Moreover, knowledge of the ratio's disparate racial impact—which is the majority's rationale for distinguishing the constitutional validity of the ratio's initial enactment from the constitutional invalidity of its continued enforcement—was recognized and rejected as the basis of the equal protection challenge in *Reece*. *See* 994 F.2d at 278 (noting the defendant's use of statistics to show a disparate racial impact, but holding that evidence

of such impact was insufficient because "only purposeful discrimination merits strict scrutiny").

Another point bears mentioning.  The majority's basic premise is that the continued enforcement of a sentencing regime that equates one gram of crack cocaine to one hundred grams of powder cocaine violates the Equal Protection Clause because it has a known disparate racial impact.  Yet the majority apparently has no problem with the Fair Sentencing Act's reduction of that disparity to an 18-to-1 ratio.  Why, however, is a 100-to-1 ratio—but not an 18-to-1 ratio—an equal protection violation?  In my opinion, the lack of any constitutionally relevant distinction between the old ratio and the new ratio further undermines the majority's equal protection rationale.

Having addressed the shortcomings of the majority's sua sponte constitutional argument, I turn now to the argument that the Blewetts actually presented: i.e., that the Supreme Court's interpretation of the Fair Sentencing Act in *Dorsey v. United States*, 132 S. Ct. 2321 (2012), makes the Act fully retroactive as applied to defendants seeking modification of a mandatory-minimum sentence in a proceeding under 18 U.S.C. § 3582(c)(2).  As noted above, however, the *Hammond* decision has already rejected the Blewetts' proposed reading of the Fair Sentencing Act, and it did so "in light of *Dorsey*." *Hammond*, 2013 WL 1363908, at *2.  My colleagues in the majority, moreover, have previously joined in unpublished decisions that reached the same conclusion as set forth in *Hammond*.  *See United States v. Mundy*, 486 F. App'x 598, 598-99 (6th Cir. 2012) (per curiam decision joined by Judge Martin); *United States v. Stanley*, No. 11-4423, 2012 WL 4014932, at *3 (6th Cir. Sept. 12, 2012) (opinion joined by Judge Merritt).  In short, *Hammond* is the law of this circuit and cannot be overturned by this panel.

But even if we were to approach this issue with no prior circuit precedent to bind us, the Blewetts' argument would fail because 18 U.S.C. § 3582(c)(2) allows a court to modify a term of imprisonment that has already been imposed only if two conditions are met:  (1)  the defendant's sentence was based on a sentencing range that has subsequently been lowered by the Sentencing Commission, and (2) a reduction in the defendant's sentence would be consistent with the so-called "policy statement" found

at U.S. Sentencing Guidelines § 1B1.10.  The Blewetts, however, were sentenced under a *mandatory-minimum statute* that was subsequently amended by *Congress*, not a "*sentencing range* that has subsequently been lowered by the *Sentencing Commission*." 18 U.S.C. § 3582(c)(2) (emphases added).

In an effort to satisfy the first condition of 18 U.S.C. § 3582(c)(2), the majority notes that "[t]he statutory minimums are closely integrated into the structure of the revised guidelines." Maj. Op. 13-14.  But why this close integration precludes Congress from treating the two sentencing schemes differently is unexplained.  *See Hammond*, 2013 WL 1363908, at *2 (holding that the defendant's mandatory-minimum sentence "has not subsequently been lowered by the Sentencing Commission" and therefore could not qualify for a modification under § 3582(c)(2) (internal quotation marks omitted)).

The Blewetts fare no better under 18 U.S.C. § 3582(c)(2)'s second condition because only those amendments to the Guidelines included in USSG § 1B1.10(c) may trigger eligibility for a sentence modification under § 3582(c)(2).  USSG § 1B1.10, cmt. n.1(A) (2012).  Guideline § 1B1.10(c) incorporates Amendment 750 (parts A and C only), which implemented certain aspects of the Fair Sentencing Act.  Part A amended the Drug Quantity Table found in USSG § 2D1.1 that is used to calculate sentencing ranges, while part C eliminated the reference in USSG § 2D2.1 to a five-year mandatory-minimum sentence for simple possession of more than five grams of crack cocaine.

In contrast, the Blewetts asked the district court for a sentence modification under 18 U.S.C. § 3582(c)(2) based on the Fair Sentencing Act's amendment of 21 U.S.C. § 841(b)(1), the latter providing the mandatory-minimum sentences for drug-trafficking offenses.  But neither part A nor part C of Amendment 750 includes the changes made to § 841(b)(1).  Because the Blewetts seek the benefit of a statutory amendment that was not incorporated into USSG § 1B1.10, they are ineligible for a modification of their sentences.  *See Hammond*, 2013 WL 1363908, at *2 (holding that the district court did not have authority to reduce a defendant's sentence under § 3582(c)(2) because the defendant's mandatory-minimum sentence "was not an amendment incorporated into the Sentencing Commission's policy statement").

The *Dorsey* decision strongly supports the proposition that the Fair Sentencing Act's amendment of a statutory mandatory-minimum sentence provides no relief to defendants seeking modification of a sentence under 18 U.S.C. § 3582(c)(2) because changes in criminal penalties generally apply to defendants not yet sentenced, but do not apply to defendants already sentenced. *See Dorsey*, 132 S. Ct. at 2335. A proceeding under § 3582(c)(2) is a modification of a previously imposed sentence and is not itself a sentencing or resentencing. *Dillon v. United States*, 130 S. Ct. 2683, 2690 (2010) ("By its terms, § 3582(c)(2) does not authorize a sentencing or resentencing proceeding."). The Fair Sentencing Act therefore applies to not-yet-sentenced defendants such as those in *Dorsey*, but does not apply to already-sentenced defendants, such as the Blewetts, who seek § 3582(c)(2) modifications. *See Dorsey*, 132 S.Ct. at 2335 (distinguishing the initial imposition of a sentence under 18 U.S.C. § 3553 from the modification of a sentence under § 3582(c) and recognizing that disparities "will exist whenever Congress enacts a new law changing sentences," but concluding that the disparity created by the Court's decision reflects "the ordinary practice" in federal sentencing); *see also Hammond*, 2013 WL 1363908, at *2 (noting that "*Dorsey* itself disfavors [retroactive application of the Fair Sentencing Act] in the context of § 3582").

Finally, the majority contends that "it cannot seriously be argued that race does not play a role in the failure to retroactively apply the Fair Sentencing Act." Maj. Op. 8. To the contrary, the failure to retroactively apply the Fair Sentencing Act is solely due to a faithful interpretation of the statutory scheme and a recognition of the rule of stare decisis. Congress is of course free to amend the Fair Sentencing Act to make it fully retroactive, but that is a legislative prerogative and not appropriate for this court to do simply by decree.

For all of the reasons set forth above, I respectfully dissent.