6/5/2020 8:53:51 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **18-1334.pdf** | versus | **18-1334_new.pdf** |
| **15 pages (299 KB)** | | **15 pages (348 KB)** |
| 6/1/2020 8:43:10 AM | | 6/5/2020 8:48:56 AM |

**Total Changes**

# 2

**Content**

2 Replacements

0 Insertions

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 1)

the people of Puerto Rico for approval. *Id.*, at 223.

In 1952, "both Puerto Rico and the United States ratified Puerto Rico's Constitution." *Sánchez Valle*, 579 U. S., at ___ (BREYER, J., dissenting) (slip op., at 8). The people of Puerto Rico first approved the draft Constitution in a referendum. Congress then approved the draft Constitution with modifications, noting the caveat that it "shall become effective" only when Puerto Rico "declare[s] in a formal resolution its acceptance." 66 Stat. 327–328. Finally, the constitutional convention approved the modified Constitution. Thus, although the terms of the compact provided for Congress' approval, "when such constitution did go into effect pursuant to the resolution of approval by the Congress, it became what the Congress called it, a 'constitution' under which the people of Puerto Rico organized a government of their own adoption." *Figueroa* v. *Puerto Rico*, 232 F. 2d 615, 620 (CA1 1956) (citation omitted). "The Commonwealth's power, the [Puerto Rico] Constitution proclaims, 'emanates from the people and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States.'" *Sánchez Valle*, 579 U. S., at ___ (slip op., at 4).

With the passage of Public Law 600 and the adoption and recognition of the Puerto Rico Constitution, "the United States and Puerto Rico . . . forged a unique political relationship, built on the island's evolution into a constitutional democracy exercising local self-rule." *Id.*, at ___ (slip op., at 2); cf. *Calero-Toledo*, 416 U. S., at 672 (noting with approval the view that, after Public Law 600, Puerto Rico became "a political entity created by the act and with the consent of the people of Puerto Rico and joined in union with the United States of America under the terms of the compact" (quoting *Mora* v. *Mejias*, 206 F. 2d 377, 387 (CA1 1953))).

Of critical import here, the Federal Government "relinquished its control over [Puerto Rico's] local affairs[,]

grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by the States." *Examining Bd. of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 597 (1976). Indeed, the very "purpose of Congress in the 1950 and 1952 legislation was to accord Puerto Rico the degree of autonomy and independence normally associated with States of the Union." *Id.*, at 594; see also S. Rep. No. 1779, 81st Cong., 2d Sess., 2 (1950) (Public Law 600 was "designed to complete the full measure of local self-government in" Puerto Rico); H. R. Rep. No. 2275, 81st Cong., 2d Sess., 6 (1950) (Public Law 600 was a "reaffirmation by the Congress of the self-government principle").[1] The upshot is that "Puerto Rico, like a State, is an autonomous political entity, '"sovereign over matters not ruled by the [Federal] Constitution."'" *Rodriguez* v. *Popular Democratic Party*, 457 U. S. 1, 8 (1982) (quoting *Calero-Toledo*, 416 U. S., at 673). And only by holding out that guarantee to the United Nations has the Federal Government been able to disclaim certain continuing obligations it previously owed with respect to Puerto Rico under the United Nations Charter. See *infra*, at 11–12.

B

In the decades that followed, Puerto Rico underwent further changes as a Commonwealth. For many years, the island experienced dynamic growth, increasing its gross national product more than fourfold from 1950 to 1971. Cheatham, Council on Foreign Relations, Puerto Rico: A U. S. Territory in Crisis (Feb. 13, 2020). In 1976, after the

---

[1] To be sure, Public Law 600 reserved certain limited powers to Congress (some of which were soon repealed). See *ante*, at 12–13. But those narrow reservations of federal control did not purport to diminish the full measure of territorial self-governance conferred upon the people of Puerto Rico through Public Law 600 and the Puerto Rico Constitution. See 39 Stat. 953; 64 Stat. 319–320.

revised Federal Tax Code conferred preferential tax treatment on productive industries in Puerto Rico, Puerto Rico developed robust pharmaceutical and manufacturing sectors. Issacharoff, Bursak, Rennie, & Webley, What Is Puerto Rico? 94 Ind. L. J. 1, 27 (2019).

Eventually, however, the island and its people confronted several economic setbacks. Congress repealed Puerto Rico's favorable tax credits, and manufacturing growth deflated, precipitating a prolonged recession. Steady outmigration correlated with persistently high unemployment rates greater than 8 percent. Dept. of Labor, Bureau of Labor Statistics, Databases, Tables & Calculators by Subject (May 28, 2020). Deprived of its primary sources of income, the Commonwealth began borrowing heavily. The island's outstanding debts rose to approximately $70 billion, a sum greater than its annual economic output. Puerto Rico's credit ratings were downgraded to junk levels, D. Austin, Congressional Research Service, Puerto Rico's Current Fiscal Challenges 4, 13 (June 3, 2016), rendering borrowing practically impossible. Without any realistic ability to set its finances on the right course, the island declared bankruptcy in 2016.

Months later, Hurricane Maria made landfall, causing immense devastation and a humanitarian emergency the likes of which had not been seen in over a century. The island suffered thousands of casualties and an estimated $90 billion in damages. Most recently, significant earthquakes have further rattled an already shaken population and economy still recovering from the impact of Hurricane Maria. Robles, Months After Puerto Rico Earthquakes, Thousands Are Still Living Outside, N. Y. Times, Mar. 1, 2020.

## C

Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 130 Stat.

549, 48 U. S. C. §2101 *et seq.*, in the midst of Puerto Rico's dramatic reversal of fortune, with the aim of mitigating the island's "severe economic decline," see 48 U. S. C. §2194(m)(1). To that end, the statute establishes a Financial Oversight and Management Board to oversee the island's finances and restructure its debts. See *ante*, at 3–4; Issacharoff, 94 Ind. L. J., at 30–31.

The Board's decisions have affected the island's entire population, particularly many of its most vulnerable citizens. The Board has ordered pensions to be reduced by as much as 8.5 percent, a measure that threatens the sole source of income for thousands of Puerto Rico's poor and elderly. Walsh & Russell, $129 Billion Puerto Rico Bankruptcy Plan Could Be Model for States, N. Y. Times, Sept. 29, 2019. Other proposed cuts take aim at already depleted healthcare and educational services. It is under the yoke of such austerity measures that the island's 3.2 million citizens now chafe.

PROMESA does not provide for the appointment of Board members according to the straightforward methods set out in the Appointments Clause. U. S. Const., Art. II, §2, cl. 2 (requiring principal "Officers of the United States" to be nominated by the President, with Senate advice and consent). Instead, the statute prescribes a labyrinthine procedure by which the Speaker of the House, majority leader of the Senate, minority leader of the House, and minority leader of the Senate each submit to the President separate lists with any number of candidates; and the President, in turn, selects individuals from each of those lists, plus an individual in his sole discretion. See §101(e), 130 Stat. 554– 555.[2] With only one exception, then, the President is not

_____

[2] Specifically, PROMESA provides that "[t]he Board shall be comprised of one Category A member, one Category B member, two Category C members, one Category D member, one Category E member, and one Category F member." §101(e)(1)(B), 130 Stat. 554. The Speaker of the House submits "separate, non-overlapping list[s]" for the Category A and

"singly and absolutely" responsible for any members of the Board. The Federalist No. 77, p. 461 (C. Rossiter ed. 1961) (A. Hamilton) (Appointments Clause ensures that "[t]he blame of a bad nomination . . . fall[s] upon the President singly and absolutely"). And with no exceptions, the Senate fails to advise or consent to the President's selections.

Despite the Board's wide-ranging, veto-free authority over Puerto Rico, the solitary role PROMESA contemplates for Puerto Rican-selected officials is this: The Governor of Puerto Rico sits as an ex officio Board member without any voting rights. §101(e)(3), 130 Stat. 555. No individual within Puerto Rico's government plays any part in determining which seven members now decide matters critical to the island's financial fate.

## II

### A

In concluding that the Board members are territorial officers not subject to the strictures of the Appointment Clause, the Court does not meaningfully address Puerto Rico's history or status. Nor need it, as the parties do not discuss the potential consequences that Congress' recognition of complete self-government decades ago may have on the Appointments Clause analysis. But in my view, however one distinguishes territorial officers from federal officers (whether under the Court's "primarily local" test, *ante*, at 14, or some other standard), the longstanding compact between the Federal Government and Puerto Rico raises

---

Category B members, the majority leader for the Senate submits a list for the two Category C members, the majority leader of the House submits a list for the Category D member, and the minority leader of the Senate submits a list for the Category E member. §101(e)(2)(A), *id.*, at 554–555. Finally, "the Category F member may be selected in the President's sole discretion." §101(e)(2)(A)(vi), *id.*, at 555. Many other conditions apply to the lists submitted and the individuals who may appear on them. See generally §§101(e)–(f ), *id.*, at 554–556.

grave doubts as to whether the Board members are territorial officers not subject to the Appointments Clause. When Puerto Rico and Congress entered into a compact and ratified a constitution of Puerto Rico's adoption, Congress explicitly left the authority to choose Puerto Rico's governmental officers to the people of Puerto Rico. That turn of events seems to give to Puerto Rico, through a voluntary concession by the Federal Government, the exclusive right to establish Puerto Rico's own territorial officers.

No less than the bedrock principles of government upon which this Nation was founded ground this proposition. When the Framers resolved to build this Nation on a republican form of government, they understood that the American people would have the authority to select their own governmental officers. See, *e.g.*, The Federalist No. 39, at 251 (J. Madison) ("[W]e may define a republic to be . . . a government which derives all its powers directly or indirectly from the great body of the people"); A. Amar, America's Constitution: A Biography 278–279 (2005) ("[T]he general understanding of republicanism across America" at the founding embraced a concept of government "in which 'the people are sovereign'; in which 'the people are consequently the fountain of all power'; in which 'all authority should flow from the people'"). Core to the 1950s "compact" between the Federal Government and Puerto Rico was that Puerto Rico's eventual constitution "shall provide a republican form of government." §2, 64 Stat. 319 (codified in 48 U. S. C. §731c). Thus, "resonant of American founding principles," the Puerto Rico Constitution set forth a tripartite government "'republican in form' and 'subordinate to the sovereignty of the people of Puerto Rico.'" *Sánchez Valle*, 579 U. S., at \_\_\_ (slip op., at 4) (quoting P. R. Const., Art. I, §2); see also *Torres* v. *Puerto Rico*, 442 U. S. 465, 470 (1979). "[T]he distinguishing feature" of such "republican form of government," this Court has recognized over and again, "is

the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *In re Duncan*, 139 U. S. 449, 461 (1891) (discussing the republican governments of the States); see also *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118, 149 (1912) (same).

Thus, whatever authority the Federal Government exercised to select territorial officers for Puerto Rico before Congress recognized Puerto Rico's republican form of government, the authority "to choose [Puerto Rico's] own officers for governmental administration" now seems to belong to the people of Puerto Rico. *Duncan*, 139 U. S., at 461. Indeed, however directly responsible the Federal Government was for Puerto Rico's local affairs before Public Law 600, those matters might be said to "now procee[d]" in the first instance "from the Puerto Rico Constitution as 'ordain[ed] and establish[ed]' by 'the people.'" Cf. *Sánchez Valle*, 579 U. S., at ___ (slip op., at 15) (quoting P. R. Const., Preamble) (acknowledging "that the Commonwealth's power to enact and enforce criminal law now proceeds . . . from the Puerto Rico Constitution," "mak[ing] the Puerto Rican populace . . . the most immediate source of such authority").

The developments of the early 1950s were not merely symbolic either; this Court has recognized that the paradigm shift in relations between Puerto Rico and the Federal Government carried legal consequences. In *Calero-Toledo*, for instance, this Court held that the "enactments of the Commonwealth of Puerto Rico" were " 'State statute[s]' " within the meaning of a federal law requiring a three-judge court panel to consider any action seeking to enjoin a "'State statute.'" 416 U. S., at 675–676. The Court reasoned that Puerto Rico was entitled to similar treatment as the States under the federal law, due to "significant changes in Puerto Rico's governmental structure" in the early 1950s. See *id.*,

at 670–674. For similar reasons, this Court has recognized on multiple other occasions that Puerto Rico is akin to a State in key respects. See, *e.g.*, *Flores de Otero*, 426 U. S., at 597 (Congress granted Puerto Rico "a measure of autonomy comparable to that possessed by the States"); *Rodriguez*, 457 U. S., at 8 ("Puerto Rico, like a state, is an autonomous political entity"); see also *Sánchez Valle*, 579 U. S., at ___ (BREYER, J., dissenting) (slip op., at 3) ("[T]he parallels between admission of new States and the creation of the Commonwealth [of Puerto Rico] are significant").

The compact also had international ramifications, as the Federal Government repeatedly represented at the time. Shortly after the ratification and approval of the Puerto Rico Constitution, federal officials certified to the United Nations that, for Puerto Rico, the United States no longer needed to comply with certain reporting obligations under the United Nations Charter regarding territories "whose peoples have not yet attained a full measure of self-government." Charter of the United Nations, 59 Stat. 1048, Art. 73, June 26, 1945, T. S. No. 993 (U. N. Charter). According to federal officials, that was because the people of Puerto Rico now had "complete autonomy in internal economic matters and in cultural and social affairs under a Constitution adopted by them and approved by the Congress." Memorandum by the Government of the United States of America Concerning the Cessation of Transmission of Information Under Article 73(e) of the Charter With Regard to the Commonwealth of Puerto Rico, in A. Fernós-Isern, Original Intent in the Constitution of Puerto Rico 153 (2d ed. 2002). To the extent federal law had previously "directed or authorized interference with matters of local government by the Federal Government," federal officials elaborated, "[t]hose laws . . . ha[d] been repealed." *Ibid.*; see also *ibid.* ("Congress has agreed that Puerto Rico shall have, under [the Puerto Rico] Constitution, freedom from

control or interference by the Congress in respect of internal government and administration").

Based on those explicit representations, the United Nations General Assembly declared that the people of Puerto Rico "ha[d] been invested with attributes of political sovereignty which clearly identify the status of self-government attained . . . as that of an autonomous political entity." G. A. Res. 748, U. N. GAOR, 8th Sess., Supp. No. 17, U. N. Doc. A/2630 (Nov. 27, 1953). And consistent with that declaration, the Federal Government promptly stopped complying with the Charter's reporting obligations with respect to Puerto Rico (and has never since recommenced). Thus, in the eyes of the international community looking in, as well as of the Federal Government looking out, Puerto Rico has long enjoyed autonomous reign over its internal affairs. Indeed, were the Federal Government's representations to the United Nations merely aspirational, the United States' compliance with its international legal obligations would be in substantial doubt. See Lawson & Sloane, The Constitutionality of Decolonization by Associated Statehood: Puerto Rico's Legal Status Reconsidered, 50 Boston College L. Rev. 1123, 1127 (2009) (arguing that if Puerto Rico remains "just another territory subject to Congress' plenary power under the Territories Clause," "the United States . . . is in violation of its international legal obligations vis-à-vis Puerto Rico").

There can be little question, then, that the compact altered the relationship between the Federal Government and Puerto Rico. At a minimum, the post-compact developments, including this Court's precedents, indicate that Congress placed in the hands of the Puerto Rican people the authority to establish their own government, replete with officers of their own choosing, and that this grant of self-government was not an empty promise. That history prompts serious questions as to whether the Board members may be territorial officers of Puerto Rico when they are

not elected or approved, directly or indirectly, by the people of Puerto Rico.

## B

Of course, it might be argued that Congress is nevertheless free to repeal its grant of self-rule, including the grant of authority to the island to select its own governmental officers. And perhaps, it might further be said, that is exactly what Congress has done in PROMESA by declaring the Board "an entity within the territorial government" of Puerto Rico. §101(c)(1), 130 Stat. 553. But that is not so certain.

This Court has "'repeatedly stated . . . that absent "a clearly expressed congressional intention"'" to repeal, "'[a]n implied repeal will only be found where provisions in two statutes are in "irreconcilable conflict," or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute."'" *Carcieri* v. *Salazar*, 555 U. S. 379, 395 (2009) (quoting *Branch* v. *Smith*, 538 U. S. 254, 273 (2003) (plurality opinion)). Not so, it seems, with PROMESA on the one hand, and Congress' 1950 and 1952 legislations on the other. As written, PROMESA is a temporary bankruptcy measure intended to assist in restoring Puerto Rico to fiscal security. It is not an organic statute clearly or expressly purporting to renege on Congress' prior "gran[t to] Puerto Rico [of] a measure of autonomy comparable to that possessed by the States," *Flores de Otero*, 426 U. S., at 597, nor on the concomitant grant of authority to select officers of its own choosing. It would seem curious to interpret PROMESA as having done so indirectly, simply through its characterization of the Board "as an entity within the territorial government." §101(c)(1), 130 Stat. 553.

Further, there is a legitimate question whether Congress could validly repeal any element of its earlier compact with

Puerto Rico on its own initiative, even if it had been abundantly explicit in its intention to do so. The truism that "one Congress cannot bind a later Congress," *Dorsey* v. *United States*, 567 U. S. 260, 274 (2012), appears to have its limits: As scholars have noted, certain congressional actions are not subject to recantation. See, *e.g.*, Magruder, The Commonwealth Status of Puerto Rico, 15 U. Pitt. L. Rev. 1, 14 (1953) (listing as examples the congressional grant of independence to the Philippine Islands and congressional grant of private title to public lands under homestead laws); Issacharoff, 94 Ind. L. J., at 14 ("Once a Congress has disposed of a territory, of necessity it binds future Congresses to the consequences of that decision"); T. Aleinikoff, Semblances of Sovereignty: The Constitution, the State, and American Citizenship 90 (2002) ("The granting of neither statehood nor independence may be revoked, nor may land grants or other 'vested interests' be called back by a subsequent Congress").

Plausible reasons may exist to treat Public Law 600 and the Federal Government's recognition of Puerto Rico's sovereignty as similarly irrevocable, at least in the absence of mutual consent. Congress made clear in Public Law 600 that the agreement between the Federal Government and Puerto Rico was "in the nature of a compact." 64 Stat. 319. That "solemn undertaking, based upon mutual consent, . . . of such profound character between the Federal Government and a community of U. S. citizens," has struck many as "incompatible with the concept of unilateral revocation." *E.g.*, Report of the United States-Puerto Rico Commission on the Status of Puerto Rico 12–13 (1966); see also A. Leibowitz, Defining Status: A Comprehensive Analysis of United States Territorial Relations 172–173 (1989) (describing how "many in the Congress" understood Public Law 600 to constitute "an irrevocable grant of authority in local affairs with an understanding of mutual consent being required before Congress would resolve the ultimate status

question or change the status of the Commonwealth"). In-deed, shortly after Congress approved the Puerto Rico Con-stitution, federal officials expressly represented to the United Nations that the compact was of a "bilateral na-ture," such that its "terms [could] be changed only by com-mon consent." F. Bolton, U. S. Rep. to the Gen. Assembly, Statement to U. N. Committee IV (Trusteeship) (Nov. 3, 1953), reprinted in 29 Dept. State Bull. 802, 804 (1953); see also Press Release No. 1741, U. S. Mission to the United Nations, Statement by M. Sears, U. S. Rep. in the Comm. on Information From Non-Self Governing Territories 2 (Aug. 28, 1953) ("[A] compact . . . is far stronger than a treaty" because it "cannot be denounced by either party un-less it has the permission of the other").[3]

All of this presses up against broader questions about Congress' power under the Territories Clause of Article IV,

—————————

[3] In opting to proceed with Puerto Rico's Commonwealth endeavor by way of compact, Public Law 600 was not entirely without precedent. When Congress enacted the Northwest Ordinance prior to Ratification to govern the newly acquired Northwest Territory, it provided for a cat-alog of fundamental rights, styled as "articles of compact between the original States and the people and States in the said territory" that would "forever remain unalterable, unless by common consent." Act of Aug. 7, 1789, 1 Stat. 52, n. (*a*) (reproducing the Northwest Ordinance of 1787). That understanding of a compact between the Federal Govern-ment and the Territories was the only extant precedent for the compact language in Public Law 600, and proponents of Public Law 600 were vo-cal in their reliance on the Northwest Ordinance as a model. See Lawson & Sloane, The Constitutionality of Decolonization by Associated State-hood: Puerto Rico's Legal Status Reconsidered, 50 Boston College L. Rev. 1123, 1149, n. 142 (2009) (prior to Public Law 600, "[t]he term 'compact' . . . had seldom appeared in U. S. law," with the exception of the North-west Ordinance and subsequent organic statutes modeled after the Northwest Ordinance); J. Trías Monge, Puerto Rico: The Trials of the Oldest Colony in the World 111 (1997) (discussing debate among the drafters of Public Law 600 about whether to adopt the precise compact language in the Northwest Ordinance).

U. S. Const., Art. IV, §3, cl. 2, the purported source of legislative authority for enacting PROMESA, see §101(b)(2), 130 Stat. 553; *ante*, at 5.  May Congress ever simply cede its power under that Clause to legislate for the Territories, and did it do so nearly 60 years ago with respect to Puerto Rico?  If so, is PROMESA itself invalid, at least insofar as it holds itself out as an exercise of Territories Clause authority?  This Court has never squarely addressed such questions, except perhaps to acknowledge that Congress' authority under the Territories Clause may "continu[e] until granted away."  *National Bank* v. *County of Yankton*, 101 U. S. 129, 133 (1880); cf. *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 319 (1937) (recognizing that a statute preparing the Philippine Islands for independence from the United States "brought about a profound change in the status of the islands and in their relations to the United States," such that "the power of the United States has been modified," even while "it has not been abolished").

After all, the Territories Clause provides Congress not only the power to "make all needful Rules and Regulations respecting the Territor[ies]," but also the power to "dispose of" them, which necessarily encompasses the power to relinquish authority to legislate for them.  U. S. Const., Art. IV, §3, cl. 2.  And some have insisted that the power to cede authority exists no less in the absence of full "dispos[al]" through independence or Statehood.  See Aleinikoff, Semblances of Sovereignty, at 77 ("It has been strongly argued that" with "the establishment of commonwealth status," "Congress lost general power to regulate the internal affairs of Puerto Rico").

Still, the parties here do not dispute Congress' ability to enact PROMESA under the Territories Clause in the first place; nor does it seem strictly necessary to call that matter into question to resolve the Appointments Clause concern presented here.  Despite the "full measure of self-government" the island supposedly enjoys, U. N. Charter, Art. 73; see

also *supra*, at 4–5, 9–12, Puerto Rico can well remain a "Territory" subject to some measure of Congress' Territories Clause authority. But even assuming that the Territories Clause thus enables Congress to enact federal laws "respecting" Puerto Rico, U. S. Const., Art. IV, §3, cl. 2, still some things the Clause does not necessarily do: It does not necessarily allow Congress to repeal by mere implication its prior grant of authority to the people of Puerto Rico to choose their own governmental officers. It does not necessarily give Congress license to revoke unilaterally an instrument that may be altered only with mutual consent. And it does not necessarily permit Congress to declare by fiat that the law must treat its exercise of authority under the Territories Clause as territorial rather than federal, irrespective of the compact it entered with the people of Puerto Rico leaving complete territorial authority to them. Cf. Hernández Colón, The Evolution of Democratic Governance Under the Territorial Clause of the U. S. Constitution, 50 Suffolk U. L. Rev. 587, 605 (2017) (after 1952, "Congress partially relinquished its territorial powers over Puerto Rico's *internal* affairs, as recognized in *Sanchez Valle*," even while "Congress continues to retain territorial powers in *federal* affairs" (emphasis added)).

## III

Nor is it significant that Congress has historically provided for the appointment of officers who perform duties related to the Territories through methods other than those prescribed by the Appointments Clause. Those methods may be permissible up to a point in a Territory's development. But that historical practice does not, in my view, resolve the far more complex question whether Congress can continue to act in that manner indefinitely or long after granting Territories complete self-government.

Essentially none (if any) of the allegedly nonconforming

appointments referenced by the parties occurred in circumstances where, as in the case of Puerto Rico, Congress previously granted the Territories complete home rule. See *infra*, at 19–21, and nn. 4–5. Instead, they largely occurred during the initial or transitional stages of a Territory's existence, when often the terms of the organic statute establishing the Territory expressly provided for the Federal Government to act on behalf of the Territory. (After all, in newly established Territories, no recognized territorial government existed until the organic statute established one.) Because in that state of affairs, an organic statute plainly contemplated that *Congress* had authority to establish offices for the Territory, such congressionally established offices could fairly—indeed, necessarily—be treated as "territorial" to the extent they were tasked with territorial duties.

Does that necessarily remain the case if Congress later grants or establishes complete territorial self-government? As Puerto Rico's history may demonstrate, it is seemingly at that point that Congress purports to recognize that the Territory itself (not the Federal Government) wields authority over matters of the Territory, including the ability to select its own territorial officers. Perhaps it is also at that point that a distinction between territorial officers and federal officers crystallizes: Territorial officers are those who derive their authority from the people of the Territory; federal officers are those who derive their authority from the Federal Government. And here, the Board members indisputably are selected by the Federal Government, under a statute passed by Congress that specifies not just their governance responsibilities but also the priorities of their decisionmaking. See *ante*, at 3–4.

The scores of historical vignettes highlighted by petitioners, see, *e.g.*, Brief for Petitioner Financial Oversight and Management Board for Puerto Rico 28–33; Brief for Peti-